**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | | |
|---|---|---|
| WEBER AIRCRAFT, L.L.C., | § | |
| Plaintiff | § | |
| v. | § | Case No. 4:12-cv-00666-RC-ALM |
| VIKRAM KRISHNAMURTHY, | § | |
| MOUMITA ROY, RYAN VAUGHN and | § | |
| ANTONIO VENTORINI, | § | |
| Defendants. | § | |

## DEFENDANTS KRISHNAMURTHY, ROY, AND VENTORINI'S MOTION FOR SUMMARY JUDGMENT AND INCORPORATED MEMORANDUM OF LAW

Pursuant to Fed. R. Civ. P. 56 and LR CV-56, Defendants Vikram Krishnamurthy ("Krishnamurthy"), Moumita Roy ("Roy"), and Antonio Ventorini ("Ventorini") (collectively the "AZ Defs"), by and through their undersigned counsel, hereby move this Court for summary judgment as to all claims contained in the First Amended Complaint (the "Complaint") filed by Plaintiff Weber Aircraft, L.L.C. ("Weber"), and in support therefore, state as follows:

## I    INTRODUCTION

Weber has sued the AZ Defs for breach of a covenant not to compete signed while the three were employed by Weber as certification engineers.  Weber seeks monetary damages and an injunction that would apparently require the AZ Defs to resign from their current positions with B/E Aerospace ("B/E") in Tucson, Arizona.  As established below, Weber's claims are not supported by law or record evidence and the undisputed facts mandate that both of Weber's claims for relief be dismissed as to these defendants.

Discovery has established that, in response to a flood of dissatisfied engineers fleeing to competitor aerospace companies, Weber required the AZ Defs to execute mandatory non-compete Agreements during their employment.  In violation of Texas law, there was no new or additional consideration of any kind for these non-compete agreements.  Further, just two weeks

before, Weber had re-classified its certification engineers and removed their ability to receive overtime compensation for work over 40 hours in a week. With the ongoing departure of many engineers, the remaining engineers were forced to spend longer and longer hours, for no additional pay, simply to meet Weber's demands. Understandably, the AZ Defs looked for and found employment elsewhere – with B/E's Tucson, Arizona division.

Discovery has also established that the AZ Defs work on a B/E product line that, as Weber admits, in not manufactured or certified by Weber and would not involve the use of any information that Weber deems confidential. Weber further admits that there is no evidence whatsoever that the AZ Defs solicited any other Weber employees to join them at B/E. Finally, Weber admits that has no evidence that the departure of the AZ Defs caused it irreparable harm. Based on these binding admissions alone, summary judgment is appropriate.

The AZ Defs are entitled to summary judgment on Count I for at least five distinct and independent reasons. If this Court agrees that Weber has failed to create a genuine dispute as to any material fact as to any of these five arguments, Count I (and by extension, Count II) must be dismissed in its entirety. Additionally, the AZ Defs are entitled to summary judgment on Count II for at least four additional distinct and independent reasons.

The AZ Defs request that this Court enter summary judgment in their favor as to all Counts, dismiss the First Amended Complaint with prejudice and, pursuant to Tex. Bus. & Comm. Code § 15.51(c), award them their attorneys' fees incurred in defending against Weber's improper and overbroad efforts to assert these unenforceable restrictive covenants.

## II      STATEMENT OF THE ISSUES

### A.      Count I of the Complaint

1.      Is the Agreement unenforceable on its face?

2.      Can the Agreement be enforced in the absence of consideration?

3.      Even if enforceable without consideration, is the Agreement unreasonably vague and ambiguous as to its scope?

4.      Even if it was enforceable, is the Agreement an unreasonable restraint in violation of public policy?

5. Even assuming that the Agreement is enforceable and breached, does Weber have any evidence of damages?

**B.    Count II of the Complaint**

1. Is injunctive relief available to Weber in the absence of irreparable harm?

2. Does the balance of hardships favor Weber?

3. Are the AZ Defs entitled to the equitable defenses of unclean hands, waiver and/or estoppel?

4. Is Weber's claim for injunctive relief moot because the agreements have expired?

### III    STATEMENT OF UNDISPUTED MATERIAL FACTS

**A.    Weber Hires Each of the AZ Defs In Positions Wherein They Work Exclusively on the Certification of Commercial Aircraft Seating.**

1. Krishnamurthy began his career at Weber in July 2006, after being hired by Rakibul Islam ("Islam"), Weber's Director of Engineering and Certification at the time. [Exhibit ("Exh.") A, Krishnamurthy Deposition ("Depo.") Transcript ("Tran."), 13:17-18, 14:24-15:3; Exh. B, Krishnamurthy Depo. Exh. 34] Upon hire, Krishnamurthy signed an Assignment of Inventions Agreement, included in the Plaintiff's Employee Handbook. **[Exh. C, Declaration of Joseph A. Kroeger ("Kroeger Dec."), ¶¶ 2, 5; Exh. 1 to Kroeger Dec., Weber Assignment of Inventions Agreements, WEBER 33709; Exh. 4 to Kroeger Dec., Weber Aircraft Trade and Secrecy Policy/Assignment of Invention Agreement, WEBER 34162-34165]** Krishnamurthy reviewed and analyzed designs of aircraft seats and seat components, such as the armrests, seat band, backrest, and tray tables. [Exh. A, Krishnamurthy Depo. Tran., 93:3-94:1] During Krishnamurthy's entire career at Weber, he **solely worked on commercial aircraft seating and seating components**. [Id., 93:14-94:1; Krishnamurthy's First. Supp. Answers to Plaintiff's First Set of Interrogatories, Response No. 5] In fact, in Krishnamurthy's nearly six-year career at Weber, the certification group <u>never</u> certified any products other than commercial aircraft seating and seating components. [Id., 110:18-110:21]

2. Defendant Moumita Roy began her employment at Weber in November 2005. [Exh. E, Roy Depo. Tran., 13:15-13:16; Exh. F, Roy Depo. Exh. 2] Upon hire, Roy signed an

Assignment of Inventions Agreement, included in the Plaintiff's Employee Handbook. [Ex. C, Kroeger Dec., ¶ 3; Exh. 2 to Kroeger Dec., WEBER 33532] During the entire course of her employment at Weber, the <u>only</u> products Roy worked on were **commercial aircraft seats**. [Exh. E, Roy Depo. Tran., 13:15-13:16; Exh. F, Roy Depo. Exh. 2; Ex. G, Roy's First. Supp. Answers to Plaintiff's First Set of Interrogatories, Response No. 5] During her employment at Weber, Roy married Krishnamurthy. [Exh. E, Roy Depo. Tran., 9:1-5]

3. Defendant Antonio Ventorini began his employment at Weber in May 2010 as a Certification Engineer. [Exh. H, Ventorini Depo. Tran., 15:1-16:11; Exh. I, Ventorini Depo. Exh. 73] Upon hire, Ventorini signed an Assignment of Inventions Agreement, included in the Plaintiff's Employee Handbook. [Exh. C, Kroeger Dec., ¶ 4; Exh. 3 to Kroeger Dec., Weber 33848] During the entire course of his employment, the <u>only</u> products Ventorini worked on were **commercial aircraft seats**. [Exh. J, Ventorini's First Supp. Answers to Plaintiff's First Set of Interrogatories, Response No. 5; Exh. H, Ventorini Depo. Tran. 175:8-176:16]

**B. In November 2010, Weber Required the Arizona Defendants to Sign Invention and Confidentiality/Non-Compete Agreements Without Providing Any Consideration, and Even Though Their Job Responsibilities and Access to Confidential Information Remained Entirely Unchanged.**

4. Prior to November 2010, no contractual agreements prevented Weber certification engineers from leaving to work for any competing company. [Exh. K, Weber 30(b)(6) Depo. (Rojas) Tran., 41:5-18; Exh. A, Krishnamurthy Depo. Tran., 151:21-23] In November 2010, Weber decided to implement the unenforceable Invention and Confidentiality/Non-Compete Agreements ("Agreements" or "Agreement") that give rise to this lawsuit. [Docs. 8-1 through 8-4] The Agreement provides that the employee agrees not to be engaged in a competing business within a global geographic territory for a period of one-year after the employee's employment with Weber ends. [<u>Id.</u> at ¶ 8] It further defines the term "Competing Business" as "concept development, design, prototyping, analysis, test, certification, manufacture and sale of **seating system, seating products and any sub components of the seating system**. . . ." [<u>Id.</u> (emphasis added)] The definition was thus expressly focused on aircraft "seating products." [<u>Id.</u>] The

definition also specifically included "B/E Aerospace," but does not limit the restriction to B/E Aerospace's business divisions that actually manufactured and certified "seating products" for commercial jets, as opposed to those divisions that manufacture non-seating products. [Id.] The Agreement states that "if Employee engages in any business which is directly or indirectly competitive with the Company, such action will inevitably result in the disclosure of Confidential Information in violation of this Agreement. [Id.] The Agreement also prohibits unauthorized use or disclosure of confidential information and the unauthorized solicitation of Weber employees, customers, vendors, or suppliers. [Id. at ¶ 11] The first line of the Agreement states, "In consideration of my employment by Weber … the Company's agreement to provide me with access to Confidential Information, and the compensation paid to me by Company, [name of employee] (hereinafter referred to as "Employee") hereby agrees that:" [Id. at p. 1]

5.      On November 10, 2010 Krishnamurthy signed a copy of the Agreement. [Doc 8-1; Exh. A, Krishnamurthy Depo. Tran., 142:13-23]   Krishnamurthy's agreement was countersigned by Islam, the same supervisor who had initially interviewed Krishnamurthy for his first Weber position and subsequently promoted him to his management position. [Id.] Krishnamurthy's compensation and access to confidential information were unchanged by his assent to the Agreement. [Id., 231:17-25; Exh. D, Krishnamurthy's First Supp. Answers to Plaintiff's First Set of Interrogatories, Response No. 8] At the time he signed the Agreement, Krishnamurthy understood the primary purpose of the Agreement to be to discourage Weber employees from departing to Recaro, an understanding he gained from conversations with Weber management, including then Vice-President Islam. [Exh. A, Krishnamurthy Depo. Tran. 144:8-145:23] Both before and after signing the Agreement, Krishnamurthy was employed at-will, with no obligation or right to remain employed at Weber for any duration of time.

6.      Roy signed the Agreement on November 10, 2010. [Exh. E, Roy Depo. Tran., 51:18-25; Doc. 8-2] At the time Roy signed the Agreement, she did not receive a bonus or a promotion in return for her signature, nor did she receive any additional access to confidential information [Exh. K, Weber 30(b)(6) Depo. (Rojas, Vol. I) Tran., 79:24-80:5]   Based on

representations by management, including Islam, Roy understood that the primary purpose of the Agreement was to prevent Weber employees from departing to Recaro, a nearby seat supplier. [Exh. E, Roy Depo. Tran. 54:24-56:24] Both before and after signing the Agreement, Roy was employed at-will, with no obligation or right to remain employed at Weber for any duration of time.

7.      On the following day, November 11, 2010, Weber presented the Agreement to Ventorini and required him to sign it. [Exh. H, Ventorini Depo. Tran., 75:10-19; 92:24-94:3; Doc. 8-4] Like Roy and Krishnamurthy, Ventorini received no bonus, promotion, or different access to confidential information in return for his signature. [Exh. K, Weber 30(b)(6) Depo. (Rojas, Vol. I) Tran. 79:24-80:5; Exh. J, Ventorini's First Supp. Answers to Plaintiff's First Set of Interrogatories, Response No. 7] Both before and after signing the Agreement, Ventorini was employed at-will, with no obligation or right to remain employed at Weber for any duration of time.

8.      Before the Agreements were implemented, certification engineers had access to designs and all of the information related to any programs that they were working on. [Weber 30(b)(6) Depo. (Rojas, Vol. I) Tran., 84:6-11] Weber cannot identify any additional access to confidential information that was granted to certification engineers after implementing the Agreements. [Id., 90:1-11]

**C.      Separately, But Around the Same Time Period, Weber Eliminated Overtime Pay For Its Certification Engineers, While Simultaneously Requiring Certification Engineers to Work Even Longer Hours With No Additional Compensation.**

9.      Prior to November 2010, non-management level certification engineers at Weber were eligible for and paid overtime at a straight rate for all hours worked over 40 per week. [Id., 26:4-14; 41:5-9] In November 2010, Weber eliminated overtime compensation for certification engineers, including Roy and Ventorini. [Id., 26:4-14]

10.     Around this time, Krishnamurthy became concerned that Weber was not hiring new employees at a fast enough rate to keep up with the workload. [Exh. A, Krishnamurthy Depo. Tran., 172:14-174:15; Exh. K, Weber 30(b)(6) Depo. (Rojas Vol. I) Tran., 46:13-22; Exh.

L, Rojas Depo Exh. I] The lack of certification engineers caused reshuffling of priorities and programs. [Exh. K, Weber 30(b)(6) Depo. (Rojas, Vol. I) Tran., 52:3-10; Exh. M, Rojas Depo. Exh. K] On February 23, 2012, Fabrice Morel, a Lead Certification Engineer at Weber, sent an email to Weber management, including Reeves, Krishnamurthy, and Roy, stating, "We are obviously not going in the right direction, and with workload we have and our resources reduced, we will soon have serious issues to deal with, which include compliance issues." [Exh. K, Weber 30(b)(6) Depo. (Rojas Vol. I) Tran., 56:7-18; Exh. N, Rojas Depo. Exh. L] By the end of February 2012, Weber was losing certification engineers on a weekly basis. [Exh. K, Weber 30(b)(6) Depo. (Rojas Vol. I) Tran., 51:14-52:2; Exh. M, Rojas Depo. Exh. K]

11.     When Weber was unable to replace departing certification engineers, the remaining certification engineers, including Krishnamurthy, Roy, and Ventorini, shouldered a heavier workload. [Exh. K, Weber 30(b)(6) Depo. (Rojas Vol. I) Tran., 45:15-19; Exh. E, Roy Depo. Tran., 257:2-10; Exh. H, Ventorini Depo. Tran. 127:2-128:1, 171:4-18] The pressure on the overextended certification engineers to meet deadlines was so intense that Roy was told by a management employee: "[P]lease don't tell me procedures are always followed around here. If Weber failed to bend a few procedures from time to time we would miss many many more [customer deadlines]." [Exh. K, Weber 30(b)(6) Depo. (Rojas Vol. I) Tran., 62:16-18; Exh. O, Rojas Depo Exh. M]

**D.     The AZ Defs Joined the Exodus of Certification Engineers Leaving Weber in 2011-2012, But Consciously Chose to Depart to a Division of a Company That Manufactured and Certified a Product That They Had Never Worked On While Employed at Weber.**

12.     Weber admits that requiring its certification engineers to work increased hours for no additional pay is not "a recipe for high morale amongst certification engineers." [Exh. K, Weber 30(b)(6) Depo. (Rojas Vol. I) Tran., 46:6-12]

13.     In September 2011, concerns about the work environment at Weber led Krishnamurthy and Roy, a married couple, to begin seeking new employment. [Exh. A, Krishnamurthy Depo. Tran. 247:3-7; Exh. E, Roy Depo. Tran., 203:17-204:7] During a meeting

of the Society of Automotive Engineers ("SAE"), an aircraft seating industry working group, Krishnamurthy and Roy learned that B/E Aerospace ("B/E") had an opening at its Tucson, Arizona division. [Exh. A, Krishnamurthy Depo. Tran., 247:13-248:8] Islam gave Krishnamurthy and Roy the contact information for Jim Yuhas, Vice President of Engineering for B/E Tucson, ("Yuhas") with the knowledge that they intended to contact him in pursuit of new employment. [Exh. E, Roy Depo. Tran., 203:17-204:7]

14. Krishnamurthy and Roy were aware that B/E Tucson does not design, certify, or manufacture aircraft seats, so they believed that seeking employment at B/E Tucson would not violate the non-compete provisions of their Agreements with Weber, based on the fact that the non-competition provision of the Agreement referred to seating and seating products. [Id., 63:14-66:25; 67:14-68:16; 209:4-209:15; 235:1-7; Exh. A, Krishnamurthy Depo. Tran., 169:3-8; 268:6-11; Exh. G, Roy's First Supp. Answers to Plaintiff's First Set of Interrogatories, Response No. 7; Exh. D, Krishnamurthy's First Supp. Answers to Plaintiff's First Set of Interrogatories, Response No. 7]

15. Krishnamurthy and Roy contacted Yuhas and expressed their interest in potential employment opportunities at B/E Tucson. [Exh. D, Krishnamurthy First Supp. Answers to Plaintiff's First Set of Interrogatories, Response 1; Exh. G, Roy's First Supp. Answers to Plaintiff's First Set of Interrogatories, Response No. 1] After months of correspondence, Krishnamurthy accepted a position as Certification Manager for Super First Class Suites at B/E Tucson. [Exh. P, Krishnamurthy's First Supp. Answers to Plaintiff's First Set of Requests for Admission ("Krishnamurthy RFA"), Response Nos. 1 and 32] Roy accepted a position as a Project Engineer at B/E Tucson. [Exh. E, Roy Depo. Tran., 31:3-8; 32:20-22] On April 6, 2012, Krishnamurthy and Roy tendered their resignation at Weber. [Exh. K, Weber 30(b)(6) Depo. (Rojas, Vol. I) Tran., 21:10-14] They both commenced their employment at B/E Tucson on April 16, 2012. [Exh. P, Krishnamurthy RFA, Response No. 26; Ex. Q, Roy's First Supp. Answers to Plaintiff's First Set of Requests for Admission, Response No. 25]

16. Independently and without knowledge of Krishnamurthy or Roy's prospective

employment at B/E Tucson, Ventorini decided to pursue new employment opportunities as a result of his dissatisfaction with the workload, compensation and treatment of the certification engineers at Weber.  [Exh. H, Ventorini Depo. Tran., 60:12-22; 117:9-119:4]

17.     In March of 2012, Ventorini contacted Andrew Walbert, an Account/Recruiting Manager at COMFORCE corporation, about employment opportunities in the aerospace industry.  [Exh. H, Ventorini Depo. Tran., 147:16-148:11; Exh. J, Ventorini's First Supp. Answers to Plaintiff's First Set of Interrogatories, Response No. 1]  Walbert informed Ventorini of an opportunity at B/E Tucson.  [Id., Ventorini Depo. Tran., 147:12-13][1]  Ventorini ultimately accepted a position as a Certification Engineer at B/E Tucson.  [Exh. R, Ventorini's First Supp. Answers to Plaintiff's First Set of Requests for Admission ("Ventorini RFA"), Response No. 28]  Ventorini tendered his resignation on April 27, 2012.  [Exh. K, Rojas Depo, 21:5-8]

18.     When Ventorini tendered his resignation to his supervisor at Weber, Dianna Sabo ("Sabo"), she reassured him "don't worry about the agreement that you signed because they don't enforce those things anyway." [Exh. H, Ventorini Depo. Tran., 154:11-155:21]  On May 7, 2012 Ventorini started his employment at B/E Tucson.  [Exh. R, Ventorini RFA, Response No. 24]  On his first day, he was surprised to discover that Krishnamurthy and Roy were also now employed at B/E Tucson.  [Exh. H, Ventorini Depo. Tran., 60:12-22]

**E.     In Spring 2012, the AZ Defs Began Working at B/E Tucson, A Division that Designs and Certifies Only Super First Class Suites and Does Not Design, Test, Certify, or Manufacture Aircraft Seats of Any Kind.**

19.     B/E's Tucson division is responsible for the design and certification of a single line of non-seating products: Super First Class Suites.  [Exh. A, Krishnamurthy Depo. Tran., 26:10-16]  Super First Class Suites are fully enclosed cabins, which create a private environment for the passenger.  [Exh. E, Roy Depo. Tran., 40:14-17]  Each Suite is customized to customer demands.  [Exh. H, Ventorini Depo. Tran., 44:4-45:13]  Consequently, each Super First Class

---

[1] The record evidence is undisputed that Ventorini learned of the B/E Tucson opportunity through Walbert, a third-party headhunter, and not through co-Defendant Ryan Vaughn.

Suite product requires a distinct testing program.  [Id.]

20.      Weber does not design, manufacture, or certify any product that it identifies as a Super First Class Suite.  [Exh. S, Weber 30(b)(6) Depo. (Reeves Vol. 1) Tran., 46:14-24]  B/E has no direct competitors in the Super First Class Suite market.  [Exh. A, Krishnamurthy Depo. Tran., 83:10-20]

21.      B/E Tucson has no role in the design, manufacture, or certification of any aircraft seats.  [Exh. E, Roy Depo. Tran., 40:19-25; 48:7-14; Exh. H, Ventorini Depo. Tran., 33:20-34:14]  Rather, B/E Tucson is responsible for the design and certification of Super First Class Suite **furniture**.  [Exh. E, Roy Depo. Tran., 40:19-25; 48:7-14; Exh. H, Ventorini Depo. Tran., 33:20-34:14]

22.      In his current role at B/E Tucson, Krishnamurthy manages the certification process solely for the **non-seating components** of Super First Class Suites.   [Exh. A, Krishnamurthy Depo. Tran., 53:19-60:19; 64:18-65:24; Exh. D, Krishnamurthy's First Supp. Answers to Plaintiff's First Set of Interrogatories, Response No. 5]  Since starting at B/E, he has not managed the certification of a single aircraft seat, nor does he supervise any employee who generates or implements testing procedures for aircraft seating.  [Exh. A, Krishnamurthy Depo. Tran., 39:21-46:23; 49:21-51:2; 95:21-96:11; Exh. D, Krishnamurthy's First Supp. Answers to Plaintiff's First Set of Interrogatories, Response No. 5]

23.      In her current role as a Project Engineer in the Super First Class Suites Division at B/E Tucson, Roy designs Super First Class Suites and related components.  [Exh. E, Roy Depo. Tran., 36:3-36:12; Exh. G, Roy's First Supp. Answers to Plaintiff's First Set of Interrogatories, Response No. 6]  Thus, while she was employed by Weber as a **certification** engineer throughout her employment, she is employed by B/E Tucson as a **design** engineer with entirely different job duties than she had at Weber. [Exh. E, Roy Depo. Tran., 35:25-36:21]  In her current role at B/E Tucson, she does not design or certify any type of aircraft seating.  [Id., 36:10-12; 36:16-37:23; Exh. G, Roy's First Supp. Answers to Plaintiff's First Set of Interrogatories, Response No. 6]  Indeed, since starting at B/E Tucson, Roy has not performed

certification work of any kind, let alone certification of commercial aircraft seating. [Id., Roy Depo. Tran., 37:25-38:10]

24.     In his current role as a Certification Engineer for Super First Class Suites at B/E Tucson, Ventorini primarily generates flammability test plans for Super First Class Suites. [Exh. H, Ventorini Depo. Tran., 19:10-19:19; 24:23-25:12; Exh. J, Ventorini's First Supp. Answers to Plaintiff's First Set of Interrogatories, Response No. 6] He does not generate test plans or perform testing for any type of aircraft seating. [Exh. H, Ventorini Depo. Tran., 28:21-24; 31:4-15; Exh. J, Ventorini's First Supp. Answers to Plaintiff's First Set of Interrogatories, Response No. 6] B/E's flammability testing takes place at an FAA approved lab off-site, so Ventorini does not participate in the testing itself. [Exh. J, Ventorini's First Supp. Answers to Plaintiff's First Set of Interrogatories, Response No. 6] Instead, he writes the test plans to ensure compliance with FAA requirements. [Id.]

25.     As Weber's Corporate Representative admitted, Weber does not certify any aircraft furniture. [Exh. S, Weber 30(b)(6) Depo. (Reeves Vol. II) Tran., 168:11-169:19] Instead, Weber exclusively certifies aircraft seating. [Id.] To the extent that any of its seating products are surrounded by furniture, that furniture is manufactured and certified by a separate entity, not Weber. [Id.]

26.     Aircraft furniture is certified through a different process than seats. [Exh. E, Roy Depo. Tran., 36:16-37:23; 38:11-39:22; 42:10-17; 98:19-99:24; Exh. A, Krishnamurthy Depo. Tran., 121:11-18] Furniture products are not certified under a TSO. [Exh. E, Roy Depo Tran., 42:10-17; 165:15-165:24; Exh. A, Krishnamurthy Depo. Tran., 121:11-18; Exh. J, Ventorini's First Supp. Answers to Plaintiff's First Set of Interrogatories, Response No. 6] Furniture is certified through a Type Certificate ("TC") or Supplemental Type Certificate ("STC"). [Exh. A, Krishnamurthy Depo. Tran., 123:21-125:10; Exh. J, Ventorini's First Supp. Answers to Plaintiff's First Set of Interrogatories, Response No. 6] Unlike the self-certification process under a TSO, aircraft furniture can only be certified by the installer. [Exh. D, Krishnamurthy's First Supp. Answers to Plaintiff's First Set of Interrogatories, Response No. 6] Weber's

Corporate Representative admitted that certification pursuant to a TC or STC is different than certification pursuant to a TSO. [Exh. S, Weber 30(b)(6) Depo. (Reeves Vol. II) Tran., 172:5-9] Weber does not certify any of its products pursuant to a TC or STC, and therefore none of the AZ Defs performed any of the certification duties they now perform at B/E pursuant to a TC or STC during their employment with Weber. [Id.,171:6-172:9]

27.      Weber's Corporate Representative admitted that Krishnamurthy's responsibilities at B/E are to oversee the certification of Super First Class Suite furniture. [Id., 173:4-8]

28.      Weber's Corporate Representative admitted that Roy's responsibilities at B/E are that she works on "furniture or what Weber deems is furniture." [Id., 172:23-173:3]

29.      Weber's Corporate Representative admitted that Weber has no basis to support a belief that Ventorini works on aircraft seating in his employment with B/E Tucson. [Id., 174:5-174:9]

**F.      By Virtue of Working on a Non-Competing and Unique Product Line, The AZ Defs Have Not Used and Have No Reason to Use Any of Weber's Confidential Information, a Fact Repeatedly Admitted by Weber.**

30.      Krishnamurthy has not used any of Weber's confidential information since he began working at B/E. [Exh. A, Krishnamurthy Depo. Tran., 90:5-10; Exh. D, Krishnamurthy's First Supp. Answers to Plaintiff's First Set of Interrogatories, Response No. 9] Weber admits that it has no evidence that Krishnamurthy has used any of Weber's confidential information during his employment with B/E. [Exh. K, Weber 30(b)(6) Depo. (Rojas, Vol. II) Tran., 309:25-310:6; Exh. S, Weber 30(b)(6) Depo. (Reeves Vol. 1) Tran., 36:6-38:12; 43:10-21; 164:4-164:17]

31.      Roy has not used any of Weber's confidential information since she began working at B/E. [Exh. G, Roy's First Supp. Answers to Plaintiff's First Set of Interrogatories, Response No. 2] Weber admits that it has no evidence that Roy has used any of Weber's confidential information during her employment with B/E. [Exh. K, Weber 30(b)(6) Depo. (Rojas, Vol. II) Tran., 309:25-310:6; Exh. S, Weber 30(b)(6) Depo. (Reeves Vol. 1) Tran., 36:6-38:12; 43:10-21; 164:4-164:17]

32.     Ventorini has not used any of Weber's confidential information since he began working at B/E.  [Exh. H, Ventorini Depo. Tran., 176:25-177:8; Exh. J, Ventorini's First Supp. Answers to Plaintiff's First Set of Interrogatories, Response No. 2]  Weber admits that it has no evidence that Ventorini has used any of Weber's confidential information during his employment with B/E.  [Exh. K, Weber 30(b)(6) Depo. (Rojas, Vol. II) Tran., 309:25-310:6; Exh. S, Weber 30(b)(6) Depo. (Reeves Vol. 1) Tran., 36:6-38:12; 43:10-21; 164:4-17]

**G.     None of the AZ Defs Have Solicited Any Current or Former Weber Employees to Join B/E.**

33.     Krishnamurthy has not solicited any current or former Weber employees to join B/E.  Weber has no evidence that Krishnamurthy solicited any current or former Weber employees.  [Exh. S, Weber 30(b)(6) Depo. (Reeves Vol. 1) Tran., 155:16-156:16]

34.     Roy has not solicited any current or former Weber employees to join B/E.  Weber has no evidence that Roy solicited any current or former Weber employees.  [Id., 155:16-156:16]

35.     Ventorini has not solicited any current or former Weber employees to join B/E. Weber cannot identify a single current or former employee that Ventorini has allegedly solicited. [Id., 157:14-25]

**H.     Weber Has No Admissible Evidence That Defendants' Conduct Caused Irreparable Harm or Monetary Damages.**

36.     Weber admits that it has no evidence that Defendants' conduct has caused it irreparable harm.  [Id., 161:7-22]  Weber admits that it cannot identify an irreparable harm that Defendant's conduct will cause in the future.  [Id., 162:23-163:2]

37.     Weber admits that it has no evidence that Defendants' conduct has caused any loss of business to Weber.  [Id., 161:23-162:1]  Weber admits that it cannot identify any loss of business that Defendant's conduct will cause in the future.  [Id., 163:3-6]

38.     Weber admits that it has no evidence that Defendants' conduct has caused any loss of goodwill to Weber.  [Id., 162:2-6]  Weber admits that it cannot identify any loss of goodwill that Defendant's conduct will cause in the future.  [Id., 163:7-10]

39.     Weber admits that it has no evidence that Defendants' conduct has caused Weber any loss of competitive position in the marketplace.  [Id., 162:7-9]  Weber admits that it cannot identify any loss of competitive position in the marketplace that defendants' conduct will cause in the future.  [Id., 163:11-14]

40.     Weber admits that it has no evidence that Defendants' conduct has caused any confusion amongst its customers.  [Id., 162:11-13]  Weber admits that it cannot identify any confusion of customers that will occur in the future because of Defendants' conduct.  [Id., 163:15-18]

41.     The only damages Weber attempted to identify were costs associated with replacing the AZ Defs, but Weber failed to provide the amounts until the 30(b)(6) deposition of Weber's Corporate Representative.  [Exh. K, Weber 30(b)(6) Depo. (Rojas Vol. I) Tran., 92:8-18; 101:7-25]  Weber's Corporate Representative admitted that the replacement costs could have been calculated at the outset of the lawsuit, but Weber never provided any such information to counsel for Defendants until the Corporate Representative's deposition.  [Id., 100:5-13]  Weber also failed to calculate any specific damages in its Initial Disclosures, dated January 14, 2013, or discovery responses [Exh. T, Plaintiff's Objections and Responses to Defendants First of Requests for Production, Response No. 34 (dated April 8, 2013); Exh. U, Plaintiff's Objections and Answers to Krishnamurthy's First Set of Interrogatories, Response No. 20 (dated April 8, 2013); Exh. V, Plaintiff's First Amended Objections and Answers to Krishnamurthy's First Set of Interrogatories, Response No. 20 (dated April 16, 2013); Exh. W, Plaintiff's Second Amended Objections and Answers to Krishnamurthy's First Set of Interrogatories, Response No. 20 (dated May 1, 2013)], as required by Fed. R. Civ. P. 26(a)(1)(A)(iii), and failed to supplement those responses until nearly one month after its 30(b)(6) deposition, even though damages were a specific topic for the 30(b)(6) deposition.  [Exh. X, Plaintiff's Third Amended Objections and Answers to Krishnamurthy's First Set of Interrogatories, Response No. 20 (dated August 28, 2013)]  All costs identified by Weber would have been incurred if the AZ Defs had left their employment with for any reason. [Exh. K, Weber 30(b)(6) Depo. (Rojas Vol. I) Tran., 102:15-

18]  None of the claimed damages can be attributed to breach of the Agreements' confidential information, non-competition and non-solicitation provisions and thus none are properly claimed by Weber.

## I.   In an Overbroad and Unenforceable Manner, Weber Attempts to Enforce the Agreements and Demands That The AZ Defs Resign Their Employment with B/E.

42.    On September 12, 2012, Weber filed the instant lawsuit, beginning with a pleading captioned, "Original Petition and Application for Temporary Restraining Order and Further Injunctive Relief," on September 12, 2012.  [Doc. 1-2]  At no time since filing its original complaint a year ago has Weber applied for a temporary restraining order or any other form of injunctive relief.  [Exh. C, Kroeger Dec., ¶ 6]

43.    The effective term of the non-compete and non-solicitation provisions of each Agreement was one year.  [Docs. 8-1 through 8-4 at ¶ 7-11]

## IV   LEGAL ARGUMENT

### A.   Standard for Summary Judgment.

"Summary judgment is warranted if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine [dispute] as to any material fact and that the movant is entitled to judgment as a matter of law."  Duval v. N. Assur. Co. of Am., 722 F.3d 300, 303 (5th Cir. 2013) (citations omitted).  "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.' "  Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).  "Rule 56 must be construed with due regard not only for the rights of persons asserting claims and defenses that are adequately based in fact to have those claims and defenses tried to a jury, but also for the rights of persons opposing such claims and defenses to demonstrate in the manner provided by the Rule, prior to trial, that the claims and defenses have no factual basis."  Id. Accordingly, summary judgment is the appropriate remedy when, as in this case, Weber has

insufficient evidence to show that there is a genuine dispute as to any material fact and Defendants are entitled to judgment as a matter of law.

**B.    As a Matter of Law, the Agreements Are Unenforceable as Written and as Applied.**

    1.    **The Agreements Are Unenforceable as Written.**

"A person's right to use his own labor in any lawful employment is ... one of the first and highest of civil rights." <u>Marsh USA Inc. v. Cook</u>, 354 S.W.3d 764, 776 (Tex. 2011) (citations omitted). To be enforceable, a covenant not to compete must be "ancillary to or part of an otherwise enforceable agreement at the time the agreement is made to the extent that it contains limitations as to time, geographical area, and scope of activity to be restrained that are reasonable and do not impose a greater restraint than is necessary to protect the goodwill or other business interest of the promise." Tex. Bus. & Com. Code § 15.50(a). The "core inquiry" of the Covenant Not to Compete Act is whether the covenant "contains limitations as to time, geographical area, and scope of activity to be restrained that are reasonable and do not impose a greater restraint than is necessary to protect the goodwill or other business interest of the promisee." <u>Marsh USA Inc.</u>, 354 S.W.3d at 777.

Co-Defendant Ryan Vaughn's Motion for Summary Judgment sets forth the various reasons why the Agreements are per se unenforceable because they lack reasonable limitations as to time, geographical area, and scope of activity and because they impose a greater restraint than necessary to protect Weber's goodwill or other business interests. These flaws in the Agreements apply equally to all Defendants, both Defendant Vaughn and the AZ Defs, and warrant summary judgment in favor of each of them. Thus, the AZ Defs hereby incorporate by reference the § IV of Vaughn's Motion for Summary Judgment.[2]

---

[2] At the outset of this litigation, the Defendants argued that factual distinctions between the AZ Defs and Vaughn justified severing the case. [Doc. 9] Though these factual distinctions led Vaughn and the AZ Defs to file the separate Motions for Summary Judgment, Vaughn's core arguments against the enforceability of the agreement apply with equal force to the AZ Defs. In addition, Vaughn's Motion for Summary Judgment correctly contends that the type of knowledge allegedly possessed by the Defendants is not in fact a legitimate, protectable business interest by virtue of the public nature of the certification process. This argument applies with equal force to the AZ Defs. Most importantly, both the AZ Defs and Vaughn work on completely different products at B/E than anything they worked on at Weber, so their employment at B/E does not threaten any of Weber's protectable interests.

The scope of the Agreement is incredibly onerous on the AZ Defs. The Agreement prohibits the AZ Defs from "engag[ing] in any business which is directly or indirectly competitive with the Company within the restricted territory for a period of one-year after the employee's employment with Weber ends." [Statement of Undisputed Facts ("SOF"), ¶ 4] It further defines the term "Competing Business" as "concept development, design, prototyping, analysis, test, certification, manufacture and sale of seating system, seating products and any sub components of the seating system. . . ." [Id.] The Agreement also specifically included "B/E Aerospace" as a "Competing Business," but failed to limit that identification to B/E's business divisions that actually manufacture and certify "seating products," as opposed to products not even manufactured by Weber. [Id.] Consequently, the Agreement would, by its terms, prevent the AZ Defs from accepting any employment at B/E, even as a janitor. As Weber alleged from the inception of this litigation and **continues to allege in its current Complaint**, to the extent that B/E and Weber are competitors, they compete in the "aircraft seating market." [Doc. 8, ¶ 10-13 ("Weber is one of the world's top manufacturers of **aircraft seats** … B/E is a direct competitor to Weber in the **aircraft seating market**, which includes first class seating.") (emphasis added)] But B/E Tucson doesn't manufacture or certify aircraft seats. Weber's attempt to extend the reach of the restriction beyond the commercial aircraft seating market offends the basic policy supporting the enforceability of non-compete agreements: to protect the goodwill or business interest of the employer without unreasonably restraining an employee's right to seek gainful employment.

In addition to being overbroad, the non-compete provision of the Agreement is unreasonably vague and ambiguous and unenforceable as a matter of law. By its express terms, the definition applies only to "seating products" and "components." [SOF, ¶4] Although still overbroad, the AZ Defs interpreted it to mean exactly that. [Id., ¶¶ 4-5] Yet, Weber argues that the Competing Business definition, despite referring on its face solely to seating products, encompasses B/E Tucson, a division that manufactures and certifies solely furniture, not seating products.

At best, the Competing Business definition is ambiguous as to whether it applies to non-seating products in the aerospace industry. Ambiguity is interpreted against the drafter, here Weber. See e.g. State Farm Fire & Cas. Co. v. Reed, 873 S.W.2d 698, 699 (Tex. 1993). Weber, a sophisticated business entity, must bear sole responsibility for drafting the Competing Business definition in an ambiguous fashion that is subject to two different interpretations. The AZ Defs' interpretation that the definition of Competing Business is limited to entities that actually manufacture aircraft seating products is not only the more reasonable interpretation, it is more in line with the Texas public policy against unreasonably broad restraints of trade. This Court should adopt the more narrow and reasonable interpretation of the ambiguous definition of "Competing Business," drafted by Weber, and find that it does not to apply to entities, such as B/E Tucson, that do not manufacture aircraft seating.

2.     **The Undisputed Evidence Demonstrates That The Agreements Are Not Supported By Adequate Consideration.**

An employer may not "spring a non-compete covenant on an existing employee and enforce such a covenant absent new consideration from the employer." Alex Sheshunoff Mgmt. Servs. L.P. v. Johnson, 209 S.W.3d 644, 651 (Tex. 2006)). "The covenant cannot be a stand-alone promise from the employee lacking any new consideration from the employer." Powerhouse Prods., Inc. v. Scott, 260 S.W.3d 693, 696 (Tex. Ct. App. 2008) (citing Sheshunoff, 209 S.W.3d at 651). Rather, "[t]he consideration from the employer 'must give rise to the employer's interest in restraining the employee from competing.'" Id. Continued employment is not sufficient consideration to support a non-compete agreement. See In re Electro-Motor, Inc., 390 B.R. 859, 867 (Bankr. E.D. Tex. 2008) ("Thus, for there to be an enforceable agreement to which a covenant not to compete can attach, it must be based upon something other than the continued employment of the employee."); Light v. Centel Cellular Co. of Tex., 883 S.W.2d 642, 645 n.5 (Tex. 1994); see also, Purselley v. Lockheed Martin Corp., 322 F. App'x 399, 402 (5th Cir. 2009) (" '[P]ast consideration' is not consideration.").

Plaintiff alleges that "[t]he Agreements are valid, supported by adequate consideration, and enforceable contracts." [Doc. 8 at ¶ 31]  In support of this allegation, Plaintiff contends that the AZ Defs "received consideration for signing in the form of access to and use of Confidential Information and training necessary for [their] work."  [Plaintiff's Response to Int. No. 16 (Krishnamurthy)]  To that end, the Agreement itself indicates that the consideration for signing the non-compete is: (1) employment with Plaintiff; (2) Plaintiff's agreement to provide access to Confidential Information; and (3) compensation.  [SOF, ¶ 4]

The record demonstrates, however, that the AZ Defs obtained nothing beyond continued employment by their signing the Agreement.  As Texas law dictates, continued at-will employment is not sufficient consideration for a covenant not to compete as a matter of law.

First, the AZ Defs were already employed with Plaintiff when presented with the Agreement and nothing about that employment changed after the Agreements were signed. [SOF, ¶¶ 5-7]  Both before and after signing the Agreement, each of the AZ Defs was employed at-will, with no obligation or right to remain employed at Weber for any duration of time. [Id.] Additionally, the AZ Defs remained employed in the same positions, with identical responsibilities and compensation, before and after signing the Agreement.  [Id.]

Second, the provision of allegedly new confidential information to the AZ Defs was not "new" consideration.  Each of the AZ Defs had access to the very same types and categories of confidential information both before and after signing the Agreement.  [SOF, ¶8]  Further, each of the AZ Defs had already signed an Assignment of Inventions Agreement **upon commencing their employment**, in which they all had **already contractually agreed not to disclose confidential and proprietary information** that they obtained from Weber as employees.  [SOF, ¶¶ 1-3]  These agreements were part of Plaintiff's Employee Handbook in the Trade and Secrecy Policy/Assignment of Invention Agreement.  [Id.].  In other words, the AZ Defs had already contractually agreed not to disclose Weber's confidential and proprietary information and had already been granted access to that confidential and proprietary information long *before* signing the Agreement.  Consequently, the AZ Defs' access to Weber's confidential information, access

they had from the first day of their employment and had already entered into a contractual agreement not to disclose, was not "new" or "additional" consideration in return for assent to the Agreement. See Digital Generation, Inc. v. Boring, 869 F. Supp. 2d 761, 775-76 (N.D. Tex. 2012) ("While [Plaintiff/Employer] alleges in its Complaint that [Defendant/Employee], by virtue of his position, had access to [Plaintiff/Employer's] confidential information, competitive counter-selling strategies, and competitive analysis for Detroit-area agencies, it does not state that this information was provided to [Defendant/Employee] **after the agreement was executed** on March 7, 2011; nor does it state that this information was **different** from information he previously had access to before signing the agreement."). This holding is fatal to Weber's consideration argument. The AZ Defs not only already had access to Weber's same confidential information from day one of their employment, before they entered into the Agreements, they had already entered into a contractual agreement that granted them access to that information. Weber's attempted after-the-fact argument that the AZ Defs were given access to new or additional confidential information **in consideration for their signature of the Agreements** is conclusively rebutted by the record evidence.

In light of these undisputed facts, Weber cannot demonstrate that the AZ Defs received valid consideration in return for their assent to the Agreement. The complete absence of any consideration provided to the AZ Defs in exchange for their signatures on the Agreement renders the Agreement unenforceable. Id. at 776 (holding that a nonsolicitation agreement is not enforceable where the employer failed to provide new consideration in the form of additional confidential information and materials not previously provided). The AZ Defs are entitled to summary judgment as a matter of law.

3.      **As Applied to the AZ Defs, the Agreement is an Unreasonable Restraint.**

Even if Weber had provided consideration, the non-competition provision cannot be enforced against the AZ Defs because their employment with B/E Tucson does not compete with Weber. Therefore, any effort by Weber to forbid that non-competitive employment is flatly anti-competitive in purpose and lacking in any legitimate protectable interest. To the extent that the

Agreement is a blanket prohibition on employment with B/E in any capacity, it is unreasonably overbroad and anti-competitive on its face and therefore unenforceable.

"The hallmark of enforcement is whether or not the covenant is reasonable." See Sheshunoff, 209 S.W.3d at 655 (citing Tex. Bus. & Com. Code § 15.50(a)). The enforceability of the covenant should not be decided on "overly technical disputes." Sheshunoff, 209 S.W.3d at 655. "Rather, the statute's core inquiry is whether the covenant 'contains limitations as to time, geographical area, and scope of activity to be restrained that are reasonable and do not impose a greater restraint than is necessary to protect the goodwill or other business interest of the promisee.'" Marsh USA Inc., 354 S.W.3d at 777. "Whether an agreement not to compete is a reasonable restraint of trade is a question of law for the court." DeSantis v. Wackenhut Corp., 793 S.W.2d 670, 682 (Tex. 1990).

To be enforceable, a covenant not to compete must be aimed at an "interest worthy of protection." Sheshunoff, 209 S.W.3d at 649. "Agreements 'which are primarily designed to limit competition or restrain the right to engage in a common calling are not enforceable.'" DeSantis v. Wackenhut Corp., 793 S.W.2d 670, 682 (Tex. 1990)(citations omitted).

Weber's self-proclaimed justification of the non-compete Agreement is that "if [an] Employee engages in any business which is directly or indirectly competitive with [Weber], such action will inevitably result in the disclosure of the Confidential Information in violation of this Agreement." [SOF, ¶ 4] However, the undisputed evidence demonstrates that the AZ Defs have not used any of Weber's confidential information, by virtue of their completely different job responsibilities working on an entirely different product line. [Id., ¶¶ 30-32] Further, Texas does not recognize the inevitable disclosure doctrine. See e.g. Cardinal Health Staffing Network, Inc. v. Bowen, 106 S.W.3d 230, 242 (Tex. App. 2003); see also M-I, L.L.C. v. Stelly, 2009 WL2355498, *7 (S.D. Tex. 2009).

There is no dispute that the AZ Defs worked exclusively on aircraft seating while employed at Weber. [Id., ¶¶ 22-24, 27-29] There is also no dispute that the AZ Defs work exclusively on furniture for Super First Class Suites at B/E. Weber's own Corporate

Representative acknowledges that the certification processes for aircraft seats and furniture are distinct. [Id., ¶ 26] Weber's Corporate Representative further admits that none of the AZ Defs ever used the certification process they currently implement at B/E Tucson during their employment at Weber. [Id.] In fact, Weber does not certify any furniture. [Id., ¶ 25] It strains credulity to suggest, as Weber's Agreement does, that the AZ Defs will inevitably disclose Weber's confidential information about the design and certification of **aircraft seats** in their current positions designing and certifying **non-seating furniture under a completely distinct process**. Not surprisingly, even Weber admits that it has not one piece of evidence that any of the AZ Defs have ever utilized any Weber confidential information during their employment with B/E Tucson. [Id., ¶¶ 30-32]

Given these undisputed facts, the AZ Defs' employment at B/E Tucson does not and cannot threaten any of Weber's legitimate protectable interests. Weber cannot contend that the AZ Defs' employment at B/E Tucson risks the inevitable disclosure of its confidential information when, in fact, there is not a shred of evidence that the AZ Defs have disclosed or used any of Weber's confidential information during the **more than 17 months** in which they have been employed by B/E Tucson. Weber has failed to produce any evidence that the AZ Defs have improperly utilized its confidential information, and Weber has failed to produce any evidence that the AZ Defs have improperly competed with Weber in their new positions. As a result, any overbroad effort by Weber to apply the Agreements to prohibit the AZ Defs' employment with B/E Tucson is unreasonable and violates applicable Texas law and public policy.

4. **Weber Has No Evidence That Any of the AZ Defs Solicited Any Current or Former Weber Employees.**

In addition to alleging that the AZ Defs breached the Agreement through their employment at B/E, Plaintiff further alleges "upon information and belief" that the AZ Defs breached the Agreement by soliciting Weber employees to work at B/E. [Doc. 8, ¶ 32] As the undisputed evidence demonstrates, and Weber admits, none of the AZ Defs have solicited any

current or former Weber employees.  [SOF, ¶¶ 33-35]  Given this undisputed admission, there is no proof whatsoever so support Weber's unfounded allegation that any of the AZ Defs have breached the non-solicitation provision of the Agreement.  Accordingly, to the extent that Count I is based on a breach of the non-solicitation provision, summary judgment must be entered.

     5.     **Weber Admits That It Has Not Suffered Irreparable Harm and Has Failed to Produce Evidence of Actual Damages That Are Attributable to the AZ Defs' Alleged Breach.**

Weber cannot identify any harm that it suffered **as a result** of the alleged breach of the Agreement by the AZ Defs.  Weber's Corporate Representative admitted in binding testimony that Weber has no evidence that Defendants' conduct has caused it any irreparable harm, loss of business, loss of goodwill, loss of competitive position in the marketplace, or confusion among customers.  [Id., ¶¶ 36-40]  These admissions render false Weber's continued allegation that, "The Defendants' conduct has caused, and will continue to cause, irreparable harm to Weber's business, including loss of business, loss of goodwill, loss of competitive position in the marketplace, confusion of customers and loss of confidential and proprietary information." [Doc. 8, at ¶ 38]  Weber further admits that it cannot identify any irreparable harm, loss of business, loss of goodwill, loss of competitive position in the marketplace, or confusion amongst customers that Defendant's conduct will cause in the future.  [Id.]

Weber's Corporate Representative further admitted that all replacement costs identified by Weber as damages would have been incurred as a result of any departure by the AZ Defs, regardless of the reason, just as it was incurring replacement costs for the multitude of other engineers who were fleeing the poor working conditions at Weber for competitors who would treat them better.  [Id., ¶ 41][3]  Weber's Corporate Representative even admitted that she did not properly identify which replacement costs were attributable to the AZ Defs' departures [Id.]  It is **Weber's** burden to properly prove damages.  It has utterly failed to meet that burden.

---

[3] The AZ Defs incorporate by reference § IV.B.2 footnote 6 of Vaughn's Motion for Summary Judgment.

Even if Plaintiff is permitted to rely on its belated and demonstrably imprecise damage calculation, none of its alleged damages were caused by Defendants' alleged **breach** of the Agreements. It is important to remember that the Agreements did not prohibit the Defendants from **leaving** Weber's employment. They prohibit the AZ Defs from disclosing and utilizing confidential information, soliciting employees, and improperly competing against Weber. None of Weber's alleged damages are attributable to any alleged breaches of those contractual obligations in the Agreement. Weber has entirely failed to demonstrate any financial loss that resulted from the AZ Defs' breach of the confidentiality, non-compete and solicitation provisions in the Agreement. Weber's failure to attribute any provable damages to actual breach of the AZ Defs' contractual obligations is yet another reason summary judgment must be entered.

**C.  Plaintiff is Not Entitled to Injunctive Relief As a Matter of Law.**

**1.  Weber Admits that It Has Failed to Produce Evidence to Show Irreparable Harm.**

For the myriad reasons set forth above, the AZ Defs are entitled to summary judgment as to Count I as a matter of law. If Count I fails, then Count II fails as well, as the requested injunctive relief is predicated upon a finding of a breach of the Agreements. [Doc. 8 at ¶ 32] Nevertheless, there are additional independent reasons Count II should be summarily dismissed.

As this Court knows, "An injunction is a **drastic** and **extraordinary** remedy, which should not be granted as a matter of course." Monsanto Co. v. Geertson Seed Farms, 130 S.Ct. 2743, 2761 (2010) (citation omitted) (emphasis added); see also Anderson v. Jackson, 556 F.3d 351, 360 (5th Cir. 2009) ("Injunctive relief is 'an extraordinary and drastic remedy,' and should only be granted when the movant has clearly carried the burden of persuasion" (citation omitted)). "A plaintiff must demonstrate: (1) that it has suffered an irreparably injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." Monsanto, 130 S.Ct. at 2761.

Weber has no evidence to warrant the extraordinary remedy of injunctive relief. While there are a variety of avenues that compel a finding that Weber cannot establish entitlement to injunctive relief as a matter of law, perhaps the most straight-forward and self-evident approach is simply to consider the binding testimony of Weber's 30(b)(6) Representative: "I do not know of any conduct that has – has caused irreparable harm to – to this point." [SOF, ¶ 36] Weber's designated Corporate Representative on the topic of damages admitted in binding fashion that Weber has **no evidence of irreparable harm**. He went on to admit that Weber had no evidence of any loss of business, goodwill or competitive position. [Id., ¶¶ 37-40] This sworn testimony, in and of itself, is **fatal** to Weber's claim for injunctive relief, because it bindingly establishes that Weber has absolutely no evidence to satisfy the very first prong of an injunctive relief claim – that Weber has "suffered an irreparably injury." Monsanto, 130 S.Ct. at 2761. For this clear-cut and compelling reason alone, summary judgment must be granted as to Count II.

### 2. As a Matter of Law, the Balance of Hardships Favors the AZ Defs.

There are additional reasons that summary judgment must be entered against Weber as to Count II. Given Weber's admission that it has not a shred of evidence that any of the AZ Defs have ever utilized any of Weber's confidential information, Weber cannot satisfy the third prong of an injunctive relief claim: that the balance of hardships between Weber and the AZ Defs warrants the extraordinary and drastic remedy of injunctive relief. To be clear, Weber's requested injunctive relief[4] includes, but is not limited to, an injunction to prevent the AZ Defs from "working for B/E or otherwise engaging in any competing business." [Doc. 8, ¶ 41] Weber seeks to force the AZ Defs to leave their jobs, and seeks this Court to enter an injunction

---

[4] Weber also requested a temporary restraining order and preliminary injunction in its First Amended Complaint (see ¶ 40), but Weber has never once moved this (or any other) Court for a temporary restraining order or a preliminary injunction. [SOF, ¶ 42] This failure by Weber to move for such relief is a telling admission by Weber not only that it sorely lacks the evidence required to meet its burden of proof to obtain such injunctive relief, but that Weber lacks truly "irreparable" harm. See Gonannies, Inc. v. Goupair.Com, Inc., 464 F. Supp. 2d 603, 609 (N.D. Tex. 2006) ("[D]elay in seeking a remedy is an important factor bearing on the need for a preliminary injunction. Absent a good explanation, a substantial period of delay militates against the issuance of a preliminary injunction by demonstrating that there is no apparent urgency to the request for injunctive relief. Evidence of an undue delay … may be sufficient to rebut the presumption of irreparable harm.").

enforcing this request.  Weber makes this request without any provable damages or evidence of irreparable harm.  [SOF, ¶ 36]

On the other side of the scale, these individuals left a dire employment situation where they were underpaid and overworked to start a new career working on an entirely different product under better conditions.  They moved several states away.  They consciously chose to join an employer who did not manufacture or certify aircraft seating.  Weber seeks to enjoin these individuals from earning a livelihood and continues to pursue its frivolous claim for injunctive relief even as discovery closes and it has absolutely no evidence to establish its entitlement to injunctive relief.  Imagine the substantial hardship to the AZ Defs if Weber's requested relief is granted.  Equity does not support such a result, when Weber has failed to demonstrate any hardship to itself, no irreparable harm at all and only a few thousand dollars of improper replacement costs.  Equity forbids such a result, and this Court should grant summary judgment as to Count II for this reason as well. See Town of Palm Valley v. Johnson, 87 S.W.3d 110, 111 (Tex. 2001) (holding that injunctive relief cannot be granted absent a showing of irreparable harm).

### 3. The Equitable Defenses of Unclean Hands, Waiver and Estoppel Prohibit Weber from Invoking This Court's Equitable Powers.

Even if Weber could establish entitlement to equitable relief, Weber's conduct establishes that Weber comes to this Court with unclean hands and therefore cannot benefit from this Court's equitable powers.   "A party seeking an equitable remedy must do equity and come to court with clean hands."  City of Fredericksburg v. Bopp, 126 S.W.3d 218 (Tex. App.-San Antonio 2003) (citation omitted).  "The doctrine of unclean hands applies to a litigant whose own conduct in connection with the same matter or transaction has been unconscientious, unjust, marked by a want of good faith or violates the principles of equity and righteous dealing."  Id. (citations omitted).

Weber does not come to this Court with clean hands.  Fundamentally, Weber made conscious decisions to: (1) increase these individuals' work hours; (2) take away their overtime

compensation at the same time as requiring them to work longer and longer hours; and (3) despite knowing these engineers were underworked and spread thin, put increasing pressure on the engineers and instructed them to cut corners and "bend" procedures. [SOF, ¶¶ 10-11] Though Weber was aware of these issues, it did not attempt to remedy them in the way one might hope a responsible company would: by hiring more engineers, increasing their pay for the additional work they were being compelled to perform or improving their working conditions. Rather, during this same period and in response to other engineers' understandable departures to other competitor companies, Weber decided to lock its engineers into mandatory non-compete agreements that forbade them from departing for competing companies that would treat them better. Even after the Agreements were entered into, however, Weber watched employee after employee depart for direct competitors without taking legal action. [Vaughn's Statement of Undisputed Facts, ¶ 27-32] Islam - the Weber Vice-President who: (1) hired Krishnamurthy; (2) held ultimate reporting authority for both Krishnamurthy and Roy; (3) promoted them to the positions they held at the time they signed the Agreement; (4) spearheaded the implementation of the Agreement; (5) told the engineering employees that the purpose of the Agreements was to prevent employees from departing to Recaro; and (6) ultimately countersigned Krishnamurthy's Agreement - actually helped introduce Krishnamurthy and Roy to a B/E Tucson vice-president in an effort to help them leave Weber and gain employment with B/E Tucson. [SOF, ¶¶ 1, 2, 5, 6, 13] And Sabo expressly told Ventorini, "Don't worry about the Agreement that you signed because they don't enforce those things anyway." [Id. at ¶ 18]

In the face of these representations by senior Weber employees, and knowing that a number of other Weber employees had already departed to competitors without consequence, the AZ Defs had every reason to believe that they could accept employment with B/E Tucson without action by Weber. In light of this conduct, Weber can hardly now come before this Court and ask it to enjoin the AZ Defs' employment with B/E Tucson. See Surgidev Corp. v. Eye Tech., Inc., 648 F. Supp. 661, 698 (D. Minn. 1986) aff'd, 828 F.2d 452 (8th Cir. 1987) ("Plaintiff admits that with the exception of the instant litigation it has never attempted to prevent a

Surgidev employee from leaving the company and taking employment with a competitor and Dennis Gears declared that when he left Surgidev [the CEO] informed him that he was free to work for another IOL company. Under the circumstances, it would be inequitable to permit plaintiff to now rely on a non-compete agreement which it has so blithely ignored in the past.") As in Surgidev, the AZ Defs had virtually been assured by Weber's own words and actions that Weber would not take issue with their departure to a company that did not even manufacture a product that Weber manufactured. [SOF, ¶¶ 13, 18-20]

The two statements by the high-level Weber management employees to the AZ Defs also support the two separate equitable defenses of estoppel and waiver. "[A] party may be estopped from asserting a right where, with actual or constructive knowledge of facts affecting his rights, the party leads another by his words or conduct to believe that he will acquiesce in the other's conduct. Finally, a waiver of rights may result where a party demonstrates intentional relinquishment of rights of which the party has full knowledge." Regional Prop., Inc. v. Financial & Real Estate Cons., 752 F2d 178, 182-83 (5th Cir. 1985) (citations omitted).

It is fair and equitable to hold Weber to the words and actions of Islam and Sabo, two of its senior management employees. Weber reassured the AZ Defs, in multiple ways, that the AZ Defs could depart to B/E without fear of enforcement of the Agreements. Weber's belated effort to reneg on these representations and improper attempt to enforce the Agreements should be found by this Court to be both waived and estopped.

### 4. The claim for injunctive relief is moot and must be dismissed.

As Defendants' Motion for Partial Judgment on the Pleadings [Doc. 44] and Defendants' Reply to Plaintiff's Opposition to Defendants' Motion for Partial Judgment on the Pleadings [Doc. 47][5] discussed in depth, it is well-settled law in Texas that once the period of a restrictive covenant has expired, a proponent of the restrictive covenant is no longer entitled to seek to

---

[5] Defendants will not waste this Court's time by recapitulating the entirety of their argument from that Motion, but Defendants incorporate by reference the arguments raised in Defendants' Motion for Partial Judgment on the Pleadings and Defendants' Reply to Plaintiff's Opposition to Defendants' Motion for Partial Judgment on the Pleadings.

enforce the same through injunctive relief.   See Leon's Fine Foods, Inc. v. McClearin, 2000 WL

277135 *1 (Tex. Ct. App. Mar. 15, 2000) (injunctive relief was moot upon expiration of non-

compete period).   In fact, this Court stated in its Report and Recommendation on Defendants'

Motion for Partial Judgment on the Pleadings, "Defendants are correct in stating that once the

period for a restrictive covenant has expired, a proponent of the restrictive covenant is no longer

entitled to seek to enforce the same through injunctive relief, and the claim for injunctive relief is

rendered moot."  [Doc. 56]  Consequently, there is no debate that a claim for injunctive relief is

moot once the period for a restrictive covenant has expired.  The Agreements' non-competition

and non-solicitation provisions expired months ago, without Weber ever having moved this

Court for either injunctive relief or equitable tolling.  [SOF, ¶ 44-45]  As a result, under Texas

law, Weber's request for injunctive relief has been rendered moot and must be dismissed.

## V      CONCLUSION

Pursuant to the foregoing, the AZ Defs have demonstrated that they are entitled to

summary judgment as a matter of law on a number of different grounds, each of which

**independently** warrants summary judgment against Weber on Count I:   (1) on its face, the

Agreement is unenforceably overbroad and ambiguous; (2) the Agreement was not supported by

adequate consideration; (3) as applied to the AZ Defs, the Agreement is an unreasonable and

unlawful restraint on trade that violates Texas public policy; (4) the AZ Defs have not solicited

any current or former Weber employees; and (5) Weber has failed to produce evidence of

damages attributable to an alleged breach of the Agreement.  The AZ Defs respectfully submit

that each of these five grounds supply an adequate and independent basis for entry of summary

judgment as to Count I of Weber's First Amended Complaint.

If this Court grants summary judgment on Count I, then, by necessity, Count II must be

dismissed, as Count II's request for injunctive relief is necessarily dependent upon a finding by

this Court that the AZ Defs breached their contractual Agreements with Weber.  Even if Count I

were permitted to survive the above five independent bases for summary judgment, however, the

AZ Defs are entitled to summary judgment as to Count II for four additional and independent

reasons: (1) Weber has failed to produce evidence showing irreparable harm; (2) as a matter of law, the balance of hardships favor the AZ Defs; (3) the equitable defenses of unclean hands, waiver, and estoppel preclude Weber from entitlement to injunctive relief; and (4) Weber's claim for injunctive relief is moot.

More than 15 months after Weber first initiated this litigation that has wasted considerable court resources and hundreds of thousands of dollars of legal expenses [Doc. 55] to both sides, the undisputed evidence now confirms what the AZ Defs have consistently and repeatedly told Weber all along: the Agreements are overbroad and unenforceable as written and they are undoubtedly unenforceable as applied to the AZ Defs. The AZ Defs now come before this Court and request that it enter summary judgment in its favor on all counts.

Dated: September 12, 2013

Respectfully submitted,

SNELL & WILMER L.L.P.
By: */s/ Joseph A. Kroeger*
Jeffrey Willis (Admitted pro hac vice)
Joseph A. Kroeger (Admitted pro hac vice)
One South Church Avenue, Suite 1500
Tucson, Arizona 85701-1630
Telephone: 520.882.1200
Facsimile: 520.884.1294
Attorneys for Defendants Vikram
Krishnamurthy, Moumita Roy, and
Antonio Ventorini

-and-

AKERMAN SENTERFITT, L.L.P.

By: */s/ Clint A. Corrie*
D. Stewart Clancy, SBN: 24027926
Clint A. Corrie, SBN: 04840300
David I. Spector (Admitted pro hac vice)
Arlene K. Kline (Admitted pro hac vice)
2001 Ross Avenue, Suite 2550
Dallas, Texas 75201
Telephone: 214.720.4300
Facsimile: 214.981.9339
Attorneys for Defendant Ryan Vaughn

## <u>CERTIFICATE OF SERVICE</u>

I certify that on September 6, 2013, Defendant Vaughn, along with Co-Defendants, filed an unopposed motion to file documents under seal. [Doc. 57] Pursuant to the Court's Order on Defendants' Unopposed Motion to File Documents Under Seal, Doc. 63, this Motion and supporting documents are being re-filed on October 15, 2013. Further, I certify that on September 12, 2013, a true and correct copy of the foregoing and supporting exhibits were electronically served upon the following at their designated addresses via U.S. mail:

> Michael A. McCabe
> Texas Bar No. 24007628
> mmccabe@munckwilson.com
> S. Wallace Dunwoody
> Texas Bar No. 24020838
> wdunwoody@munckwilson.com
> Munck Wilson Mandala, LLP
> 12770 Coit Road, Suite 600
> Dallas, TX 75251
> Telephone: 972-628-3600
> Fax: 972-628-3616
> *Attorneys for Plaintiff*

> */s/ Matthew P. Milner*
> Matthew P. Milner
> Snell & Wilmer L.L.P.