# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF TEXAS
# SHERMAN DIVISION

| | |
|---|---|
| **WEBER AIRCRAFT, L.L.C.,** § | |
| § | |
| Plaintiff, § | |
| § | Case No. 12-cv-00666 |
| vs. § | (Judge Clark / Judge Mazzant) |
| § | |
| **VIKRAM KRISHNAMURTHY,** § | |
| **MOUMITA ROY, RYAN VAUGHN and** § | |
| **ANTONIO VENTORINI,** § | |
| § | |
| Defendants. § | |

## PLAINTIFF'S OBJECTIONS TO THE REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE [DOC. 88]

Michael A. McCabe
Texas Bar No. 24007628
mmccabe@munckwilson.com
S. Wallace Dunwoody
Texas Bar No. 24040838
wdunwoody@munckwilson.com
Kelly P. Chen
Texas Bar No. 24062664
kchen@munckwilson.com
**MUNCK WILSON MANDALA, LLP**
12770 Coit Road, Suite 600
Dallas, TX 75251
Telephone: 972-628-3600
Telecopier: 972-628-3616

**ATTORNEYS FOR PLAINTIFF
WEBER AIRCRAFT, LLC**

# TABLE OF CONTENTS

I. INTRODUCTION .................................................................................................. 1

II. LEGAL STANDARD ............................................................................................ 1

III. FACTUAL AND PROCEDURAL BACKGROUND............................................ 1

    A. Weber is a worldwide airline seat manufacturer. ..............................................1

    B. Weber relies on confidential information to design, manufacture, and certify its aircraft seating products and ensures its confidential information is protected................2

    C. The Defendants worked for Weber as certification engineers. ........................3

    D. The Defendants entered into an enforceable non-compete agreement. ...........5

    E. The Defendants breached the non-compete agreement when they left Weber to work as engineers for B/E Aerospace, Weber's largest competitor. ...............5

    F. Weber suffered damages as a result of Defendants' breaches. ........................8

    G. The Magistrate Judge erred in granting Defendants' motions for summary judgment. ..........................................................................................................9

IV. ARGUMENTS AND AUTHORITIES............................................................... 10

    A. The Magistrate erred in finding the noncompetition Agreement unenforceable. ...........10

        1. The Agreement contains reasonable geographic restrictions. .................. 10

        2. The Agreement contains reasonable restrictions as to scope. ................. 12

    B. An issue of fact exists as to solicitation by Krishnamurthy and Roy..............13

    C. Weber proved that it suffered damages as a result of Defendants' breaches...................14

V. CONCLUSION................................................................................................... 15

# **TABLE OF AUTHORITIES**

Page(s)

**CASES**

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) ...............................................................................................................15

*Bertotti v. C.E. Shepherd Co., Inc.*,
    752 S.W.2d 648 (Tex. App.—Houston [14th Dist.] 1988, no writ) .................................11, 12

*Boudreaux v. Swift Transp. Co. Inc.*,
    402 F.3d 536 (5th Cir. 2005) ..................................................................................................14

*Carrillo Ramirez v. Union Pac. R. Co.*,
    No. Civ. A. SA05CA271OG, 2006 WL 1149165 (W.D. Tex. Mar. 20, 2006) .........................1

*Curtis v. Ziff Energy Grp., Ltd.*,
    12 S.W.3d 114 (Tex. App.—Houston [14th Dist.] 1999, no pet.) ...............................11, 12, 13

*Freeman v. Cty. of Bexar*,
    142 F.3d 848 (5th Cir. 1998) ....................................................................................................2

*Houston Pipe Line Co. v. Oxy Petroleum, Inc.*,
    597 S.W.2d 57 (Tex. App.—Corpus Christi 1980, writ dism'd) .............................................14

*M-I LLC v. Stelly*,
    733 F. Supp. 2d 759 (S.D. Tex. 2010) ...............................................................................12, 13

*Reeves v. Sanderson Plumbing Prods., Inc.*,
    530 U.S. 133 (2000) ...............................................................................................................15

*Salas v. Chris Christensen Sys., Inc.*,
    No. 10-11-00107-CV, 2011 WL 4089999 ...............................................................................11

*Snodgrass v. Colvin*,
    No. 11-CV-0219-P, 2013 WL 4223640 (N.D. Tex. Aug. 13, 2013) .........................................1

*Southwest Airlines Co. v. Boardfirst, LLC*,
    3:06-CV-891, 2007 WL 4823761 (N.D. Tex. Sept. 12, 2007) .........................................14, 15

*Unitel Corp. v. Decker*,
    731 S.W.2d 636 (Tex. App.—Houston [1st Dist.] 1987, no writ) ..........................................12

**STATUTES**

28 U.S.C. § 636(b)(1)(C) ................................................................................................................1

**OTHER AUTHORITIES**

FED. R. CIV. P. 72(b) .................................................................................................................1

L.R. CV-72(b) ............................................................................................................................1

# I. INTRODUCTION

Contrary to the Magistrate Judge's Report and Recommendation [Doc. 88], (1) Weber's non-compete contains reasonable geographic limitations and restrictions on scope, (2) an issue of fact exists whether Krishnamurthy and Roy violated the nonsolicitation provision, and (3) Weber suffered damages as a result of Defendants' breaches. Accordingly, Weber requests that this Court reverse the Report and Recommendation dismissing Weber's breach of contract claims against Defendants and allow Weber to proceed with its claims against Defendants.

# II. LEGAL STANDARD

Within fourteen days after being served with a copy of the magistrate judge's report and recommendation, a party may serve and file specific written objections to the proposed findings and recommendations.[1] The standard of review for a magistrate judge's decision as to dispositive matters is governed by Federal Rule of Civil Procedure 72(b), which provides that the "district judge must determine de novo any part of the magistrate judge's disposition that has been properly objected to."[2]

# III. FACTUAL AND PROCEDURAL BACKGROUND

## A. Weber is a worldwide airline seat manufacturer.

Weber is one of the world's top manufacturers of aircraft seats for airlines and major aircraft manufacturers and works with airlines and aircraft manufacturers worldwide.[3] Weber's

---

[1] FED. R. CIV. P. 72(b); *see also* L.R. CV-72(b) and 28 U.S.C. § 636(b)(1)(C).

[2] FED. R. CIV. P. 72(b); *see also Snodgrass v. Colvin*, No. 11-CV-0219-P, 2013 WL 4223640, at *13 (N.D. Tex. Aug. 13, 2013) (rejecting magistrate judge's findings, conclusions, and recommendation after conducting a de novo review); *Carrillo Ramirez v. Union Pac. R. Co.*, No. Civ. A. SA05CA271OG, 2006 WL 1149165, at *1 (W.D. Tex. Mar. 20, 2006) (rejecting the magistrate judge's recommendation after having "conducted an independent review of the record, a de novo review of the matters raised by the objections, and [a] review[] the applicable law").

[3] Ex. 1 to Pl.'s Resp. to Defs. Krishnamurthy, Roy, and Ventorini's Mot. for Summ. J. [Doc. 66] ("Pl.'s Resp. to Defs.' MSJ") at 1, ¶ 3.

customers include international airlines based in other countries.[4] Weber is a global leader in the aircraft interiors and aerospace industries, producing more than 1 million passenger seats for all types of aircraft since its founding.[5] Weber designs, manufactures, and sells all types of passenger jet seating systems, including economy, business, and first class seats.[6] B/E Aerospace, a direct competitor, sells to many of the same customers as Weber.[7]

**B.      Weber relies on confidential information to design, manufacture, and certify its aircraft seating products and ensures its confidential information is protected.**

In designing, manufacturing, testing, and certifying its seating products, Weber relies on—and utilizes—confidential and proprietary information.[8] Weber's confidential and proprietary information includes, among others, financial information, product information, supplier information, marketing information, proprietary operating software systems, procedures, startup manuals, sales training materials, brochures, customer agreements, license agreements, customer information, models, drawings, design data and reports, process specifications and procedures, test plans and reports, and engineering management and process data.[9]

---

[4] Ex. 1, Excerpts from May 31, 2013 Dep. Tr. of Antonio Ventorini ("Ventorini Dep."), at 97:20-21, 109:18-23 (discussing Weber's program to create tourist class seats for Eva Air) & 111:15-20 (discussing ROJ as a Chinese airline getting seats from Weber); *see also* Ex. 2, Excerpts from Aug. 8, 2013 Dep. Tr. of Ryan Vaughn ("Vaughn Dep."), at 14:19-16:7 (discussing customers that Vaughn worked with while at Weber, including customers in Uzbekistan, Poland, and Australia). The district court has discretion to consider additional evidence on its de novo review of objections to a magistrate judge's recommendation. *See, e.g., Freeman v. Cty. of Bexar*, 142 F.3d 848, 850-51 (5th Cir. 1998).

[5] Ex. 1 to Pl.'s Resp. to Defs.' MSJ [Doc. 66] at 1, ¶ 3.

[6] *Id.*

[7] Ex. 1, Ventorini Dep., at 98:1-19.

[8] Ex. 2 to Pl.'s Resp. to Defs.' MSJ [Doc. 66] at 1, ¶ 4.

[9] Exs. 10-12 to Pl.'s Resp. to Defs.' MSJ [Doc. 66], at § 3; Ex. 3 to Pl.'s Resp. to Def. Vaughn's Mot. for Summ. J. [Doc. 67] ("Pl.'s Resp. to Vaughn's MSJ"), at § 3 (collectively "Defs.' Employment Agreements").

At all times, Weber protects its confidential information from disclosure to unauthorized personnel and third parties.[10] For example, certain test areas and rooms at Weber have restricted access,[11] and employees have electronic key cards to access Weber's building.[12] Computers are password protected, and Krishnamurthy, as a manger, had access to certain folders in the databases that other engineers did not.[13]

To further protect against disclosure of Weber confidential and proprietary information, Weber requires its engineers to sign confidentiality and non-compete agreements, which include, among others, a prohibition of any unauthorized use or disclosure of Weber's confidential information, a one-year covenant not to compete that specifically includes B/E Aerospace, and a one-year prohibition of any solicitation of a Weber employee to work for a competing business.[14]

## C.  The Defendants worked for Weber as certification engineers.

Vikram Krishnamurthy worked as a certification manager for Weber and was responsible for, among other things, managing the certification, testing, simulation, and material process groups within Weber.[15] Krishnamurthy also was responsible for reviewing certification test plans and reports and ensuring compliance with aviation regulatory standards.[16] He managed the workload and resources for a group of over 35 engineers and technicians, as well as the department's budget, which included items such as testing costs, engineering expenses, and

---

[10] Ex. 2 to Pl.'s Resp. to Defs.' MSJ [Doc. 66] at 2, ¶ 5.

[11] *Id.*; *see also* Ex. 4 to Pl.'s Resp. to Defs.' MSJ [Doc. 66] at 209:15-22 & 212:8-17; Ex. 5 to Pl.'s Resp. to Defs.' MSJ [Doc. 66] at 128:25-130:10; Ex. 6 to Pl.'s Resp. to Defs.' MSJ [Doc. 66] at 85:8-25.

[12] *See, e.g.*, Ex. 4 to Pl.'s Resp. to Defs.' MSJ [Doc. 66] at 215:9-14.

[13] Ex. 4 to Pl.'s Resp. to Defs.' MSJ [Doc. 66] at 207:9-24.

[14] Ex. 2 to Pl.'s Resp. to Defs.' MSJ [Doc. 66] at 2, ¶ 8; *see also* Defs. Employment Agreements at 3-4, §§ 6-8.

[15] Ex. 6 to Pl.'s Resp. to Defs.' MSJ [Doc. 66].

[16] *Id.*

employee salaries.[17] He is proficient in design, analysis, testing, and certification of aircraft seating systems,[18] and developed proficiencies in certifying economy and business class seats, which are naturally adaptable to development of first class seats.[19]

As a lead certification engineer for Weber, Moumita Roy was responsible for certifying and testing of commercial and business jet aircraft seating.[20] As lead engineer, she led more than 60 percent of the department's revenue-generating projects (including 90 percent of the department's test programs) and managed and supervised a team of seven design engineers.[21] Roy was also responsible for communicating with customers, vendors, and installers.[22]

As certification engineer for Weber, Antonio Ventorini performed structural and flammability testing on aircraft seating to meet FAA and installer requirements, prepared documentation for FAA and installer submissions, gave design change recommendations based on test results, and performed aircraft layout reviews.[23]

As certification engineer for Weber, Ryan Vaughn prepared structural and flammability test plans, reports, and other qualification documents for certification and for compliance with FAA and manufacturer requirements for aircraft seating.[24] He also reviewed and analyzed engineering drawings for purposes of determining structural and flammability qualification.[25]

---

[17] *Id.*; *see also* Ex. 3 to Pl.'s Resp. to Defs.' MSJ [Doc. 66] at 113:25-116:19.

[18] Ex. 6 to Pl.'s Resp. to Defs.' MSJ [Doc. 66] at "Summary."

[19] Ex. 3 to Pl.'s Resp. to Defs.' MSJ [Doc. 66] at 130:18-131:10.

[20] Ex. 7 to Pl.'s Resp. to Defs.' MSJ [Doc. 66].

[21] Ex. 4 to Pl.'s Resp. to Defs.' MSJ [Doc. 66] at 87:1-11 & 88:2-24; *see also* Ex. 7 to Pl.'s Resp. to Defs.' MSJ [Doc. 66].

[22] Ex. 7 to Pl.'s Resp. to Defs.' MSJ [Doc. 66].

[23] Ex. 8 to Pl.'s Resp. to Defs.' MSJ [Doc. 66]; Ex. 5 to Pl.'s Resp. to Defs.' MSJ [Doc. 66] at 48:19-21.

[24] Ex. 7 to Pl.'s Resp. to Vaughn's MSJ [Doc. 67].

[25] *Id.*

**D.     The Defendants entered into an enforceable non-compete agreement.**

In connection with their employment as engineers at Weber, and because Weber goes to great lengths to ensure its confidential information is protected, each of the Defendants signed an Invention and Confidentiality/Non-Compete Agreement (the "Agreement") with Weber.[26] In addition to containing nonsolicitation and confidentiality provisions, the Agreement also contained a noncompetition provision specifically identifying B/E Aerospace as one of five competing companies covered by the one-year non-compete restriction.[27]

**E.     The Defendants breached the non-compete agreement when they left Weber to work as engineers for B/E Aerospace, Weber's largest competitor.**

Over the course of approximately seven months, and while still employed by Weber, Krishnamurthy and Roy discussed their employment opportunities with B/E Aerospace.[28] When questioned about what Krishnamurthy and Roy spoke to each other about regarding employment opportunities at B/E Aerospace, counsel instructed them not to answer, and Krishnamurthy and Roy declined to answer based upon spousal privilege.[29]

Krishnamurthy and Roy resigned from Weber on April 6, 2012[30] and began working for B/E ten days later. In his new position at B/E Aerospace, Krishnamurthy works as an engineer, supporting integration of aircraft systems, including seating and furniture.[31] Much like his job responsibilities while at Weber, Krishnamurthy is responsible for designing and directing

---

[26] *See* Defs.' Employment Agreements.

[27] *See* Defs.' Employment Agreements at § 8.

[28] *See* Pl.'s Resp. to Defs.' MSJ [Doc. 66] at 10-12.

[29] *See* Ex. 3 to Pl.'s Resp. to Defs.' MSJ [Doc. 66] at 205:15-206:6; Ex. 4 to Pl.'s Resp. to Defs.' MSJ [Doc. 66] at 265:4-24.

[30] Ex. 39 to Pl.'s Resp. to Defs.' MSJ [Doc. 66]; Ex.40 to Pl.'s Resp. to Defs.' MSJ [Doc. 66].

[31] Ex. 3 to Pl.'s Resp. to Defs.' MSJ [Doc. 66] at 33:6-10; Ex. 6 to Pl.'s Resp. to Defs.' MSJ [Doc. 66].

product testing and certification to ensure compliance with aviation regulatory standards,[32] and for reviewing and developing the department's budget, including oversight of six engineers.[33]

In her position as project engineer for B/E Aerospace, Roy is responsible for engineering and designing first class suites.[34] In that role, Roy also collaborates with B/E's seat production facility on issues, including seat placement within the cabin.[35] Roy has a team of approximately 10-12 design engineers who report to her.[36]

Approximately one month after Krishnamurthy and Roy began working for B/E Aerosapce, Ventorini also began working as an engineer at the same B/E facility.[37] In his current role as certification engineer B/E Aerospace, Ventorini performs flammability testing, assists stress engineers in their analysis, and assists certification engineers in preparing documentation related to aircraft seat structure.[38]

On January 24, 2012, Vaughn quit his employment with Weber.[39] In his exit interview, Vaughn claimed that he quit his employment with Weber "[t]o be closer to family" and that he had "not accepted any offers" of employment from any competitors.[40] This was false because

---

[32] *Compare* Ex. 6 to Pl.'s Resp. to Defs.' MSJ [Doc. 66] *with* Ex. 42 to Pl.'s Resp. to Defs.' MSJ [Doc. 66]. *See also* Ex. 3 to Pl.'s Resp. to Defs.' MSJ [Doc. 66] at 93:3-8.

[33] Ex. 3 to Pl.'s Resp. to Defs.' MSJ [Doc. 66] at 118:1-9.

[34] Ex. 4 to Pl.'s Resp. to Defs.' MSJ [Doc. 66] at 36:3-15.

[35] *Id*. at 41:13-42:3. *See also id.* at 42:18-22 (confirming that B/E's Miami facility manufactures and certifies seats).

[36] *Id*. at 34:20-35:13.

[37] Ex. 5 to Pl.'s Resp. to Defs.' MSJ [Doc. 66] at 17:15-17.

[38] *Id*. at 24:23-25:14.

[39] Ex. 19 to Pl.'s Resp. to Vaughn's MSJ [Doc. 67].

[40] *Id*.; *see also* Ex. 11 to Pl.'s Resp. to Vaughn's MSJ [Doc. 67] at 130:11-131:19.

Vaughn had already accepted an offer with B/E more than a month earlier.[41] Vaughn admitted to lying because he "didn't think that [Weber] needed to know" that he had accepted an offer.[42]

In his current position as certification engineer for B/E Aerospace, Vaughn is responsible for testing and developing designs for seating products to ensure compliance with the FAA certification process.[43] This includes performing structural qualification testing of seats, like he did at Weber.[44] As Vaughn testified, B/E clearly meets the definition of a "Competing Business" under the Agreement:

> Q. … So when [the Agreement] says "the term competing business means concept, development, design, prototyping, analysis, tests, certification, manufacture and sale of seating system, seating products and any subcomponent of the seating system and/or product for transport airplane or rotorcraft including but not limited to BE Aerospace," you thought that that wasn't referring to BE Aerospace?
> …
> A: I didn't say that. I don't think that refers to the Business Jet Group as being a competitor.
> Q: Does the Business Jet Group at BE develop seating products?
> A: Yes.
> Q: Does it design seating products?
> A: Yes.
> Q: Does it develop prototypes for seating products?
> A: Yes.
> Q: Does it perform analysis for seating products?
> A: Yes.
> Q: Does it test seating products?
> A: Yes.
> Q: Does it certify seating products?
> A: Yes.
> Q: Does it manufacture seating products?

---

[41] Ex. 20 to Pl.'s Resp. to Vaughn's MSJ [Doc. 67]. Vaughn also submitted his résumé to other aircraft manufacturers and aviation industry companies, including Aurora, Heico, Emteq, Honeywell, and Belcan, which companies are not identified in the Agreement as direct competitors of Weber. *See* Ex. 11 to Pl.'s Resp. to Vaughn's MSJ [Doc. 67] at 61:12-64:25.

[42] Ex. 11 to Pl.'s Resp. to Vaughn's MSJ [Doc. 67] at 131:1-8.

[43] *See generally* Ex. 21 to Pl.'s Resp. to Vaughn's MSJ [Doc. 67]; *see also* Ex. 11 at 98:24-111:20.

[44] *Compare* Ex. 11 to Pl.'s Resp. to Vaughn's MSJ [Doc. 67] at 107:7-109:9 *with* Ex. 7 to Pl.'s Resp. to Vaughn's MSJ [Doc. 67].

> A: Yes.
> Q: Does it sell seating products?
> A: Yes.[45]

## F. Weber suffered damages as a result of Defendants' breaches.

When the Defendants quit their employment with Weber to work for a competitor, Weber suffered damages in the form of replacement costs, training costs, immigration-related costs (for sponsoring work visas for Krishnamurthy and Roy), recruitment costs, sign-on costs, relocation costs, physical/drug screen costs, background check costs, travel costs, and loss in productivity.[46] Weber's corporate representative, Natalie Rojas, identified what replacement costs included:

> Q: Okay. Now, so tell me the elements that made up the average of the $4,400 per Certification Engineer I, please.
> A: Travel for candidates to come interview.
> …
> Q: Okay. What's the other elements of the 4,400?
> A: Agency fees.
> …
> Q: Okay. So what's the next element?
> A: So the next element was advertising cost.
> Q: What does adver—do you mean like advertising there's a—
> A: On Monster, Career Builder.[47]
> …
> Q: All right. And if we look at the very first one after Mr. Vaughn, in fact, the first position costs, according to this, $550 for advertising; is that right?
> A: Yes.
> Q: And then $2,000 for a sign-on expense for the new hire Archie Wright? Is that—am I understanding that right?
> A: Yes.
> Q: And then there was $149 for a physical and drug screen, and there was $69 for background checks for a total cost for the first position filled, even though you had open ones before, after Ryan Vaughn left was $2,218, right?
> A: Yes.[48]

---

[45] Ex. 11 to Pl.'s Resp. to Vaughn's MSJ [Doc. 67] at 120:6-13 & 120:17-121:9.

[46] Ex. 48 to Pl.'s Resp. to Defs.' MSJ [Doc. 66] at 91:8-92:18; *see also* Ex. 1 to Pl.'s Resp. to Defs.' Mot. to Strike Summ. J. Evid. [Doc. 81] ("Pl.'s Resp. to Defs.' Mot. to Strike") at 107:16-19, 108:14-15, 109:6-10 & 123:24-124:12.

[47] Ex. 1 to Pl.'s Resp. to Defs.' Mot. to Strike [Doc. 81] at 107:16-19, 108:14-15 & 109:6-10.

Weber also never received the $6,000 it paid for Vaughn's relocation and moving costs when he started his employment with Weber.[49]

Weber has been vigilant in pursuing Defendants to enforce their post-employment restrictions and, as a result, was able to prevent any identifiable competitive injury due to Defendants' employment with B/E Aerospace. By acting quickly and aggressively, Weber was able to deter any overt disclosure or misuse of confidential information. However, neither Weber nor the Court may ever know the full extent of the harm done.

### G. The Magistrate Judge erred in granting Defendants' motions for summary judgment.

On September 12, 2013, Defendants filed motions for summary judgment.[50] After full briefing by all the parties, the Magistrate Judge issued a report and recommendation, finding—among other things—that while Weber's providing confidential and proprietary information to Defendants was adequate consideration to support the Agreement[51] and the one-year non-compete and non-solicitation provisions were reasonable,[52] the Agreement was nonetheless unenforceable because it was unreasonably broad in geographic limitation and scope.[53] The Court also found that there was no evidence that Krishnamurthy and Roy violated the non-solicitation provision of the Agreement.[54] The Magistrate Judge recommended dismissing

---

[48] *Id*. at 123:24-124:12.

[49] Ex. 11 to Pl.'s Resp. to Vaughn's MSJ [Doc. 67] at 29:13-24; *see also* Ex. 48 to Pl.'s Resp. to Defs.' MSJ [Doc. 66] at 92:8-16.

[50] Def. Ryan Vaughn's Mot. for Summ. J. and Incorporated Mem. of Law [Doc. 58] & Defs. Krishnamurthy, Roy, and Ventorini's Mot. for Summ. J. and Incorporated Mem. of Law [Doc. 59].

[51] *See* Report and Recommendation [Doc. 88] at 13.

[52] *Id.* at 14.

[53] *Id*. at 16-18.

[54] *Id*. at 22.

Weber's breach of the covenants not to compete and non-solicitation provisions against Defendants Krishnamurthy, Roy, and Ventorini.[55]

With respect to Vaughn, the Magistrate Judge found that although there was a fact issue regarding whether or not Vaughn breached the non-solicitation provision contained in the Agreement, Weber could not succeed on its claim because it failed to prove any damages as a result of any alleged breach.[56] Thus, the Magistrate Judge recommended that Weber's claims against Defendant Vaughn for breach of contract be dismissed.[57]

Weber respectfully appeals the Magistrate Judge's recommendation that:

- The Agreement contains unreasonably broad geographic limitations;[58]
- The Agreement is unreasonably broad in scope;[59]
- No issue of fact exists as to whether Krishnamurthy and Roy solicited;[60] and
- Weber failed to prove any damages as a result of the Defendants' breaches.[61]

### IV. ARGUMENTS AND AUTHORITIES

**A. The Magistrate erred in finding the noncompetition Agreement unenforceable.**

**1. The Agreement contains reasonable geographic restrictions.**

The geographic scope of the restriction must be judged based on Weber's business, including the nature of the industry, the technical sophistication of the work and know-how

---

[55] *Id.* at 27.

[56] *Id.* The Magistrate Judge also entered an order simultaneously with his Report and Recommendation granting Defendants' motion to strike a spreadsheet of replacement costs Weber suffered due to Defendants' breaches of the Agreement. [Doc. 87].

[57] *Id*. at 28.

[58] *Id.* at 16-17.

[59] *Id.* at 17-18.

[60] *Id.* at 22.

[61] *Id.* at 28.

being protected, and the number and locations of Weber's customers and direct competitors.[62] Texas courts have upheld non-compete clauses that have extended to all of North America, as well as clauses that have extended to foreign countries where an employer conducts business.[63] In *Curtis*, the court upheld a non-compete prohibiting a former vice president at the company from engaging in competitive business in Canada or the United States because the list of competitors was limited to twenty companies.[64] Similarly, in *Bertotti*, the Court found that because the company conducted business throughout the United States and in numerous foreign countries, the covenant prohibiting competition "in any state of the United States or any foreign country in which [the company] does business" was reasonable as to geographic scope.[65]

The Magistrate Judge erred when he found that the non-compete was too broad because it "includes areas in which Plaintiff does not sell any products, and has no protectable business interest in those geographic areas."[66] The summary judgment evidence clearly establishes that Weber is a manufacturer of airline seating and conducts business throughout the world.[67] Weber's customers include many international airlines based in foreign countries.[68]

---

[62] *See, e.g., Salas v. Chris Christensen Sys., Inc.*, No. 10-11-00107-CV, 2011 WL 4089999, at *19 ((Tex. App.—Waco Sept. 14, 2011, no pet.).

[63] *See, e.g., Curtis v. Ziff Energy Grp., Ltd.*, 12 S.W.3d 114, 119 (Tex. App.—Houston [14th Dist.] 1999, no pet.) (holding covenant not to compete enforceable where covenant did not allow employee "to engage in competitive business in Canada or the United States [and where employer] submitted evidence to show that it limited its competitors to twenty companies" and that "[n]ot all oil and gas companies were included"); *Bertotti v. C.E. Shepherd Co., Inc.*, 752 S.W.2d 648, 654 (Tex. App.—Houston [14th Dist.] 1988, no writ) (upholding non-compete clause that extended to any state of the United States or any foreign country in which the employer conducted business as reasonable).

[64] *Curtis*, 12 S.W.3d at 119.

[65] *Bertotti*, 752 S.W.2d at 654.

[66] *See* Report and Recommendation [Doc. 88] at 17.

[67] Ex. 1 to Pl.'s Resp. to Defs.' MSJ [Doc. 66] at 1, ¶ 3.

[68] *See, e.g.,* Ex. 1, Ventorini Dep., at 97:20-21, 109:18-23 (discussing Weber's program to create tourist class seats for Eva Air) & 111:15-20 (discussing ROJ as a Chinese airline getting seats from Weber); *see*

Similar to the non-compete in the *Curtis*, the Agreement identifies only ***five*** specific Weber competitors for whom Defendants may not work after leaving Weber, including B/E Aerospace.[69] Further, B/E, a direct competitor of Weber, sells to the same customers as Weber.[70] As in *Curtis* and *Bertotti*, the Court here should also uphold and enforce the Agreement's non-compete provision because it is limited to five specific Weber competitors and encompasses the geographic area in which Weber conducts business. Such a restriction is necessary to protect Weber's business interests as a global manufacturer of aircraft seating.[71]

### 2. The Agreement contains reasonable restrictions as to scope.

The Agreement prohibits Defendants from engaging in competitive activity for five specific competitors. Contrary to the Magistrate Judge's findings, this restriction is reasonable.[72] The activities prohibited by the Agreement include design, testing, and certification of aircraft seating and seating products—exactly the type of work that Defendants currently perform as engineers for B/E Aerospace.[73]

The Agreement does not bar Defendants from working in the aerospace industry altogether; instead it prohibits Defendants only from working for another airline seat manufacturer and only for one year. Federal courts in Texas have found similar restrictions to be

---

*also* Ex. 2, Vaughn Dep., at 14:19-16:7 (discussing customers that Vaughn worked with while at Weber, including customers in Uzbekistan, Poland, and Australia).

[69] *See* Defs.' Employment Agreements at § 3.

[70] *See, e.g.,* Ex. 5 to Pl.'s Resp. to Defs.' MSJ [Doc. 66] at 98:1-19.

[71] *See, e.g., Unitel Corp. v. Decker*, 731 S.W.2d 636, 640 (Tex. App.—Houston [1st Dist.] 1987, no writ); *see also* Pl.'s Resp. to Defs.' MSJ [Doc. 66] at 16-20; Pl.'s Resp. to Vaughn's MSJ [ Doc. 67] at

[72] *See, e.g., M-I LLC v. Stelly*, 733 F. Supp. 2d 759, 797 (S.D. Tex. 2010); *Curtis*, 12 S.W.3d at 119 (upholding covenant not to compete where covenant was limited to twenty companies comprised of oil and gas consulting firms in Canada and the United States).

[73] *See, e.g.*, Ex. 42 to Pl.'s Resp. to Defs.' MSJ [Doc. 66]; Ex. 3 to Pl.'s Resp. to Defs.' MSJ [Doc. 66] at 93:3-8; Ex. 4, Roy Dep., to Pl.'s Resp. to Defs.' MSJ [Doc. 66] at 41:13-42:3 & 42:18-22; Ex. 5 to Pl.'s Resp. to Defs.' MSJ [Doc. 66] at 24:23-25:14; *see also* Pl.'s Resp. to Defs.' MSJ [Doc. 66] at 10-14; Pl.'s Resp. to Vaughn's MSJ [Doc. 67] at 10-11.

enforceable. For example, in *M-I*, the covenant not to compete prohibited the employee from competing in "any business or transaction involving oilfield displacement tools or services or any other businesses then conducted by Employer."[74] The court there held that the agreement did not create an industry-wide exclusion that encompasses all oil and gas companies, but instead restricted the employee's "competition to a reasonably narrow business area that correlates to his work."[75] Like the agreements in *M-I* and *Curtis*, the Agreement here does not contain an industry-wide exclusion; instead, it is narrowly tailored to five specific seat manufacturer competitors and delineates the specific competitive activities correlating to Defendants' work at Weber. In fact, Vaughn submitted his résumé to other aircraft manufacturers and aviation industry companies that were not identified in the Agreement as direct competitors of Weber and for whom Defendants would have been allowed to work.[76] If Vaughn or any of the other defendants had gone to work for those companies instead of Weber's largest direct competitor, B/E Aerospace, Defendants would not have breached the Agreement. But B/E Aerospace hired Defendants because of the highly relevant experience, training, and know-how they received at Weber. Given the nature of the industry and the small number of direct competitors, the Magistrate Judge erred in finding that the Agreement contained unreasonable restrictions.

**B.     An issue of fact exists as to solicitation by Krishnamurthy and Roy.**

Over the course of approximately seven months, and while still employed by Weber, Krishnamurthy and Roy discussed their employment opportunities with B/E Aerospace.[77] On multiple occasions in September 2011, Krishnamurthy and Roy (together) spoke with B/E hiring

---

[74] *M-I LLC*, 733 F. Supp. 2d at 797.

[75] *Id*.

[76] *See* Ex. 11 to Pl.'s Resp. to Vaughn's MSJ [Doc. 67] at 61:12-64:25.

[77] *See* Pl.'s Resp. to Defs.' MSJ [Doc. 66] at 10-12.

managers to discuss employment opportunities at B/E,[78] they traveled together to interview with B/E,[79] Krishnamurthy and Roy (together) had telephone conversations with B/E about prospective employment,[80] and they negotiated and received offers of employment with B/E based on each other's visa issues.[81] Krishnamurthy and Roy copied each other on emails discussing and setting up calls to discuss prospective employment with B/E.[82] There is a fact issue regarding whether Krishnamurthy and Roy violated the non-solicitation provision of the Agreement, precluding summary judgment.[83]

C.   **Weber proved that it suffered damages as a result of Defendants' breaches.**

Texas recognizes a distinction between uncertainty about the fact that damages have been sustained and uncertainty as to their amount.[84] Moreover, a plaintiff's failure to prove actual damages stemming from a breach of contract does not prevent recovery on a contract theory; nominal damages may still be obtained upon proof that a contract was formed and breached.[85]

Here, it is clear that a contract was formed and breached, resulting in damages to Weber. Weber's corporate representative testified at-length regarding the types of damages Weber suffered as a result of Defendants' termination of their employment with Weber and going to work for a direct competitor, B/E Aerospace. For example, Weber's corporate representative

---

[78] *See* Exs. 29 & 32 to Pl.'s Resp. to Defs.' MSJ [Doc. 66].

[79] *See* Exs. 30 & 31 to Pl.'s Resp. to Defs.' MSJ [Doc. 66].

[80] Ex. 29 to Pl.'s Resp. to Defs.' MSJ [Doc. 66].

[81] *See* Exs. 30, 35, 36 & 38 to Pl.s' Resp. to Defs.' MSJ [Doc. 66].

[82] *See, e.g.,* Exs. 29, 32, 33, 35, 37 & 38 to Pl.s' Resp. to Defs.' MSJ [Doc. 66].

[83] *See, e.g., Boudreaux v. Swift Transp. Co. Inc.*, 402 F.3d 536, 540 (5th Cir. 2005).

[84] *See, e.g., Southwest Airlines Co. v. Boardfirst, LLC*, 3:06-CV-891, 2007 WL 4823761, at *10 (N.D. Tex. Sept. 12, 2007).

[85] *See, e.g., id., Houston Pipe Line Co. v. Oxy Petroleum, Inc.*, 597 S.W.2d 57, 59 (Tex. App.—Corpus Christi 1980, writ dism'd) (collecting cases) (holding that "mere proof of the making and breach fully prove a plaintiff's cause of action for which he is entitled to recover at least nominal damages, regardless of whether actual damages are proved").

testified specifically, under oath and subject to cross examination, as to replacement costs (including what replacement costs included),[86] training costs, immigration-related costs (for sponsoring work visas for Krishnamurthy and Roy), recruitment costs, sign-on costs, relocation costs (at least $6,000 paid for Vaughn's relocation),[87] physical/drug screen costs, background check costs, travel costs, and loss in productivity.[88] Despite this testimony, the Magistrate Judge improperly found that Weber "could not identify any particular way in which [it] was damaged."[89] The Magistrate Judge erred in reaching this conclusion, but in any event, at a minimum, Weber is entitled to nominal damages. The Magistrate Judge erred in dismissing Weber's claims against Defendants for failure to prove damages.

## V.  CONCLUSION

Weber respectfully requests that the Court sustain Weber's objection, reverse the Magistrate Judge's January 27, 2014 Report and Recommendation, and grant Weber all other relief to which it is justly entitled.

---

[86] Ex. 25 to Pl.'s Resp. to Defs.' Mot. to Strike [Doc. 81] at 123:24-124:12 (testifying that the $4,400 average replacement cost per certification engineer included travel costs, agency fees, $550 for advertising on Monster and Career Builder, $2,000 for new hire sign-on expenses, $149 for a physical and drug screen, and $69 for background checks).

[87] Ex. 11 to Pl.'s Resp. to Vaughn's MSJ [Doc. 67] at 29:13-24; *see also* Ex. 25 to Pl.'s Resp. to Vaughn's MSJ [Doc. 67] at 92:8-16.

[88] Ex. 25 to Pl.'s Resp. to Vaughn's MSJ [Doc. 67] at 91:8-92:18; *see also* Ex. 1 to Pl.'s Resp. to Defs.' Mot. to Strike [Doc. 81] at 107:16-19, 108:14-15 & 109:6-10.

[89] Report and Recommendation [Doc. 88] at 27.  The Magistrate Judge, in striking Weber's spreadsheet of replacement costs, found that "at trial, there is no such thing as a 30(b)6) witness." *See* [Doc. 87] at 4. The parties are at the summary judgment stage, not at trial, and a court "may not make credibility determinations or weigh the evidence" in ruling on a motion for summary judgment. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254-255 (1986).

Respectfully submitted,

*/s/ Michael A. McCabe*
Michael A. McCabe
Texas Bar No. 24007628
mmccabe@munckwilson.com
S. Wallace Dunwoody
Texas Bar No. 24040838
wdunwoody@munckwilson.com
Kelly P. Chen
Texas Bar No. 24062664
kchen@munckwilson.com
**MUNCK WILSON MANDALA, LLP**
12770 Coit Road, Suite 600
Dallas, TX 75251
Telephone: 972-628-3600
Telecopier: 972-628-3616

**ATTORNEYS FOR PLAINTIFF
WEBER AIRCRAFT, LLC**

**CERTIFICATE OF SERVICE**

I hereby certify that this document was served via email to all counsel of record in accordance with the Federal Rules of Civil Procedure on February 10, 2014.

*/s/ Michael A. McCabe*
Michael A. McCabe